THE PROPELLER COMMERCE—*Transportation Company, Claimant; Fitzhugh et al., Libellants.*

1  To bring a case of collision within the admiralty jurisdiction of the Federal courts, it is not necessary to show that either of the vessels was engaged in foreign commerce or commerce between the States.

2. The admiralty jurisdiction is not taken away by the fact that the collision or other tort was committed within the body of a county.

3. Locality is the test of jurisdiction. If the collision occurred on those navigable waters which empty into the sea, or into the bays and gulfs which form a part of the sea, the maritime courts have jurisdiction.

4. A suit *in rem* for a marine tort may be prosecuted in any district where the offending thing is found.

Appeal from the Circuit Court of the United States for the southern district of New York.

This was a libel filed in the District Court by Henry Fitzhugh, De Witt C. Little, John Peck, and James Peck, against the steam propeller Commerce, (claimed by the Commercial Transportation Company as owners,) averring a collision on the Hudson river with the libellants' lake boat, the Isabella, by which the latter vessel was sunk, causing an injury to boat and cargo of $17,000. The cargo, it seems, did not belong to the libellants, but was in their custody as common carriers.

The allegations of the libel, the defence set up in the answer, the facts of the case as they appeared in evidence, and the points of law raised in the argument, are stated in so much fulness by Mr. Justice *Clifford,* that they need not be repeated here.

The libel was dismissed by the District Court; but on appeal to the Circuit Court, a decree was passed in favor of the libellants for $11,443 15, and thereupon the claimants appealed to this court.

*Mr Benedict,* of New York, for claimants.

*Mr Grant,* f New York, for libellants.

Mr. Justice CLIFFORD. This was a libel in admiralty in a cause of collision, civil and maritime, and the case comes before the court on appeal from the decree of the Circuit Court of the United States for the southern district of New York.

Recurring to the transcript, it will be seen that the libel was *in rem* against the steam propeller "Commerce," and that the suit was instituted by the appellees, as the owners of the lake boat Isabella; but the record shows, that after the process was issued, and the vessel was taken into custody, the appellants, on motion, had leave to appear, and having waived publication of notice and entered into stipulation, with sureties, both for costs and value, the vessel was discharged by consent, the stipulators agreeing, that in case of default or contumacy of the claimants, execution might issue for the amount of the stipulation against their goods, chattels, and lands. No change, however, was made in the form of the libel, and the whole proceedings in the suit were as *in rem* against the vessel. Reference will only be made to such portions of the pleadings as seem to be indispensable to a full understanding of the several questions presented for decision. Among other things, the libellants alleged, that the Isabella left the port of New York on the nineteenth day of August, 1852, for the port of Albany, fully laden with merchandise; that she, with certain other boats and barges, was in tow of the steam-tug Indiana during the voyage, and at the time the collision occurred; that the steam-tug was well manned, tackled, apparelled, and furnished, and in all respects competent for the business in which she was engaged; and that the craft composing the tow had on board the proper complement of officers and men for their protection and management. Two of the barges were attached to the steam-tug, one on the larboard and the other on the starboard side; and to show that there was no fault in the arrangement of the tow, they alleged that the Isabella was securely attached to the larboard side of another barge, and that both were towed astern of the steam-tug, at the usual and proper distance, by means of a hawser; and, in respect to the immediate circumstances of the colli-

sion, they alleged that the Isabella, in the evening of the fol-
lowing day, while ascending the river, in tow of the steam-tug
as aforesaid, and when about ten or eleven miles below the
port of her destination, was met by the propeller, coming
down the river, and bound on a voyage from the port of Al-
bany to the port of Philadelphia; and they aver, that at the
time of such meeting, the steam-tug, with all the boats and
barges in tow of her, was on the eastern side of the channel,
and in the usual and proper place for such craft when so as-
cending the river; but that the propeller, after she had passed
the steam-tug in perfect safety, suddenly and improperly
sheered to the eastward, and, through the negligence of those
in charge of her, ran against the larboard bow of the Isabella,
stove the bow from the stem, broke all the lines by which she
was attached to the barge, and so damaged her that, in a few
minutes, she sunk in the river, with all her cargo on board.
As alleged in the libel, her cargo consisted of groceries and
other merchandise, together with a steam-engine; and the
libellants alleged, that the whole amount of the loss, including
the damage to the cargo, was seventeen thousand dollars.
When the libel was filed, the propeller was in the port of New
York, and, as the libellants alleged, within the jurisdiction of
the District Court. Accordingly, they prayed process, in due
form of law, as in cases of admiralty and maritime jurisdic-
tion, and it was issued and duly served upon the vessel. On
the other hand, the claimants denied the allegation that the
steam-tug was well manned and equipped, or that the boats
and barges in tow of her had a full complement of officers
and men for their protection and management, or that the tow
was properly made up, and especially that the Isabella was at
no greater distance astern of the steam-tug than was usual
and proper. They admitted, however, that the propeller
passed the steam-tug in safety, and met the Isabella at the
time alleged, but denied that the steam-tug, or the boats and
barges in tow of her, were on the eastern side of the channel,
or in a proper place for such craft when ascending the river.

Their theory was, that the lower barge, with the boat of the
libellants attached, was on the western side of the channel,

and they accordingly alleged that the tow was out of the usual and proper place; and they expressly denied that the propeller, after passing the steam-tug, sheered at all, or so moved towards the eastern side of the channel as to cause the collision. Witnesses were examined on both sides in the District Court, and, after a full hearing, a decree was entered dismissing the libel, and the libellants appealed to the Circuit Court. Additional testimony was taken on the appeal, and the Circuit Court reversed the decree of the District Court, and entered a decree in favor of the libellants. Whereupon the claimants appealed to this court, and now seek to reverse the last named decree.

It appears from the evidence that the steam-tug, when she started from New York, had seven boats and barges in tow, but the number, although she left one at Kingston, was increased to ten in the early part of the trip. On arriving at Athens, the master, as he had been accustomed to do, rearranged the tow, in order to make it narrower for the residue of the voyage. Briefly stated, the arrangement was as follows: Two of the craft were lashed, as before, to the sides of the steam-tug; but they had two others at their stern, which were connected with them by lines put out from the stem of the boat in the rear, and attached to the stern of the boat ahead. Four of the residue, arranged abreast and lashed together, were connected with the steam-tug by a hawser about two hundred feet long, and the barge to which the boat of the libellants was attached was some three or four hundred feet astern of the whole, and was also connected with the steam-tug by a hawser. With the tow arranged in the manner described, the steam-tug proceeded slowly up the river, and passed Mull island in perfect safety. Shortly after passing the island, the master of the steam-tug, who was standing in the wheel-house, discovered two steamers coming down the river, and as they were not far distant, he went aft to see to the tow. They proved to be the propeller and the steamer Oregon, and the former, in a few minutes, passed the steam-tug some fifty or a hundred feet to the westward—so far to the west, that a schooner under mainsail and foresail, and with her main

boom out, was between the propeller and the steam-tug at the time the former passed the latter. Seeing the schooner coming up, the Oregon stopped until the schooner passed out of the way, but the propeller proceeded on her course, without any abatement of her speed, and after passing the steam-tug, and the four boats arranged abreast, sheered to the eastward, and struck the stem of the libellants' boat, and, as the witnesses state, drove it into the cabin, and parted all the lines which attached the boat to the barge. Some conflict exists in the testimony as to the precise locality where the collision occurred; but the clear inference from the whole evidence is, that it took place just after the barge, with the boat of the libellants attached, passed the point of Mull island, and it is conceded that the island is within the northern district of New York, and within the body of one of the counties of that State. Want of jurisdiction was not suggested, either in the District or Circuit Courts; but it is now insisted that the case was not cognizable in the District Court, for three reasons: First, because it did not appear that the propeller or the boat of the libellants was engaged in foreign commerce, or in commerce between the States, and, therefore, was not a case cognizable in the admiralty; second, because the collision occurred within the body of a county, and, therefore, was exclusively cognizable at common law; thirdly, because, assuming it to be a case of admiralty and maritime jurisdiction, still it was properly cognizable in the northern district of New York, and not in the southern, where the decree was rendered.

1. But the first objection could not be sustained, even if it were admitted, on the theory of fact assumed, that it was correct, for the plain reason that it is alleged in the libel, and not denied in the answer, that the propeller was bound on a voyage from the port of Albany to the port of Philadelphia, and one of the witnesses of the claimants testified that she was employed in her second trip, and that, notwithstanding the collision, she completed her voyage.

Admiralty jurisdiction, however, was conferred upon the Government of the United States by the Constitution, and in cases of tort it is wholly unaffected by the considerations sug-

gested in the proposition. Such certainly were the views expressed by this court in the case of the Genesee Chief, 12 How., 452, where the court say: "Nor can the jurisdiction of the courts of the United States be made to depend on regulations of commerce. They are entirely distinct things, having no necessary connection with one another, and are conferred in the Constitution by separate and distinct grants." When the District Courts were organized, they were authorized by Congress to exercise exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction, including all seizures under laws of impost, navigation, or trade of the United States, where the seizures are made on waters which are navigable from the sea by vessels of ten or more tons burden, within their respective districts, as well as upon the high seas: That provision of the judiciary act remains in full force and unrestricted as applied to the navigable waters of the Hudson and all the other navigable waters of the Atlantic coast which empty into the sea, or into the bays and gulfs that form a part of the sea. All such waters are, in truth, but arms of the sea, and are as much within the admiralty and maritime jurisdiction of the United States as the sea itself. · It is not denied that the admiralty has jurisdiction of torts committed on such navigable waters, nor is it denied that the waters of the Hudson, where the collision in this case occurred, are within the admiralty and maritime jurisdiction of the United States; but it is insisted that something more is wanting in order to bring the case within the cognizance of the admiralty. Our reply to that suggestion is, that locality, by all the authorities, is the test, in cases of tort, by which to determine the question whether the wrongful act is one of admiralty cognizance; and if it appears, as in cases of collision, depredations upon property, illegal disposition of ships, or seizures for breaches of revenue laws, that it was committed on navigable waters, within the admiralty and maritime jurisdiction of the United States, then the case is one properly cognizable in the admiralty. 1 Cur. Com., p. 33, Sec. 37.

2. It is assumed, in the second place, that the jurisdiction must be denied, because it appears that the collision occurred

on the Hudson river within the body of a county; but the objection presents a question that has long since been settled by this court. It was first presented in the case of *Waring et al.* vs. *Clark*, (5 How., 452,) where this court held that the question of jurisdiction was unaffected by the fact that the locality of the collision was *infra corpus comitatus*, provided it occurred in waters where the tide ebbed and flowed, which is a rule sufficiently comprehensive to control this case. That decision, however, preceded the case of the Genesee Chief, 12 How., 443, where the same rule was declared to be applicable to the lakes and the navigable waters connecting the same, although not affected by the ebb and flow of the tide. Similar views were also expressed by this court in the case of *The Magnolia*, (20 How., 298;) and in the case of *The Philadelphia, Wilmington and Baltimore Co.* vs. *The Philadelphia and Havre de Grace Co.*, (23 How., 215,) it was emphatically said, that since the case of *Waring et al.* vs. *Clark*, (5 How., 464,) the exception of *infra corpus comitatus* is not allowed to prevail. Taken together, these three decisions, we think, ought to be regarded as decisive of the point under consideration, and may well excuse us from any extended argument upon the subject.

3. But it is insisted that the case was not cognizable in the District Court for the southern district of New York. Judging from the course of the argument, it would seem that the error on this point arises from a misapplication of the established rule, that jurisdiction in the admiralty, in cases of tort, depends upon locality. Whether a wrongful act, committed upon the person or property of another, was of a character to be denominated a marine tort, and, consequently, to be regarded as the proper foundation of a suit cognizable in the admiralty, undoubtedly depends upon the locality where the wrongful act was committed, as already explained. But marine torts are in the nature of trespasses upon the person or upon personal property, and they may be prosecuted *in personam* in any district where the offending party resides, or *in rem* wherever the offending thing is found to be within the jurisdiction of the court issuing the process.

Process *in rem* is founded on a right in the thing, and the

object of the process is to obtain the thing itself, or a satisfaction out of it, for some claim resting on a real or *quasi* proprietary right in it. Consequently, the court, through its process, arrests the thing, and holds possession of it by its officers, as the means of affording such satisfaction, and in contemplation of law it is in the possession of the court itself. Bened't's Adm., p. 241, Sec. 439. Unless, therefore, the suit *in rem* can be prosecuted in the district where the property is found, it cannot be prosecuted at all, which would defeat the right of the injured party to a very beneficial remedy. Libels *in rem, in instance causes,* civil or maritime, says Mr. Greenleaf, shall state the nature of the cause, as, for example, that it is a cause civil and maritime, of contract, of tort or damage, of salvage, or possession, or otherwise, as the case may be; and if the libel is *in rem,* that the property is *within the district,* and if *in personam,* the names and place of residence of the parties. 3 Greenl. Ev., 401. It is plain that the suit *in rem* cannot be maintained without service of process upon the property, and we hold it may be prosecuted in any district where the property is found; and such undoubtedly must have been the opinion of this court in *Nelson et al.* vs. *Leland et al.,* (22 How., 48,) which, indeed, is decisive of the point under consideration. See also *Monro* vs. *Almeida,* (10 Wheat., 473.)

It is clear, therefore, on authority, that the third objection to the jurisdiction cannot be sustained; and, after a careful consideration of the evidence, we think the decision of the Circuit Court was correct upon the merits. Considerable conflict exists in the evidence on the point, whether the lower barge, with the boat of the libellants attached, was or was not on the eastern side of the channel when the collision occurred; but we think the weight of the evidence shows that the tow, as well as the steam-tug, was east of the centre of the channel. Full proof was exhibited that the steam-tug was as near the eastern side as it was safe for her to go, and the proof of that fact goes very far to sustain the entire theory of the libellants, especially as all or nearly all the witnesses who were on the several craft composing the tow concur in the statement that

the propeller made a sheer to the eastward after she passed the steam-tug, and the four boats arranged abreast.

Objections were also made to the computation of the damages, but none of them can be sustained.

One of the objections was, that the court erred in allowing damages for the injury to the cargo as well as to the boat; but the point has been so often ruled that the carrier, who is responsible for the safe custody and due transportation of the goods, may recover in cases of this description, that we do not think it necessary to do more than to express our concurrence in the rule adopted by the Circuit Court.

*The decree of the Circuit Court is therefore affirmed, with costs.*