UNITED STATES *v.* BURLINGTON & HENDERSON COUNTY FERRY Co.

*(District Court, S. D. Iowa.  June Term, 1884.)*

1. CONSTITUTIONAL LAW—NAVIGABLE WATERS OF UNITED STATES.
   Rivers are navigable waters of the United States, within the meaning of the acts of congress, in contradistinction from the navigable rivers of the states, when they form in their ordinary condition by themselves, or by uniting with other rivers, a continued highway over which commerce is or may be carried on with other states or foreign countries in the customary modes in which commerce is conducted by water.

2. SAME—NAVIGABLE WATERS OF A STATE.
   A lake or river which is completely within the limits of a state, without any navigable outlet to any other state or country, is a navigable water of the state not within the jurisdiction of the federal government.

3. SAME—JURISDICTION OF FEDERAL COURTS—HOW CONFERRED.
   In order to give jurisdiction to a federal court in any case whatever, the constitution and the statute law must concur. It is not sufficient that the jurisdiction may be found in the constitution *or* the law; the two must co-operate: the constitution as the fountain, and the laws of congress as the streams from which and through which the waters of jurisdiction flow to the court.

4. SAME—ADMIRALTY JURISDICTION EXCLUSIVE — STATE LAW CREATING OR ENFORCING MARITIME LIENS.
   The admiralty jurisdiction of the federal courts is exclusive, and all state laws creating maritime liens, or jurisdiction *in rem* to enforce such liens, are unconstitutional and void.

5. SAME—REGULATION OF COMMERCE.
   The admiralty jurisdiction of the courts of the United States cannot be made to depend on regulations of commerce. They are entirely distinct things, having no necessary connection with one another, and are conferred in the constitution by separate and distinct grants.

6. SAME — NAVIGABILITY AS TEST OF JURISDICTION — VESSELS ENGAGED IN DOMESTIC COMMERCE.

Navigability being the test of admiralty jurisdiction, the true doctrine now is that the admiralty jurisdiction of the United States courts extends to all vessels navigating the waters of the United States, whatever may be the character of the commerce in which they are engaged, whether foreign, interstate, or completely internal to the states.

7. SAME — POWER OF CONGRESS TO REGULATE NAVIGATION.

Congress has power to regulate by law the navigation of boats and vessels floating in the navigable waters of the United States when engaged exclusively in the domestic commerce of the states.

8. SAME — VIOLATION OF REV. ST. § 4466 — FERRY-BOAT — EXCURSION BETWEEN PORTS IN SAME STATE — MARITIME TORT — LIBEL IN PERSONAM.

A boat or vessel plying between two ports in the same state, upon any navigable water of the United States, but engaged exclusively in the domestic commerce of the state, is within the admiralty jurisdiction of the United States, and when a steam ferry-boat, contrary to the provision of Rev. St. § 4466, carries passengers on an excursion, largely in excess of the number allowed by her permit, and fails to carry the required number of life-preservers, she is guilty of a marine tort, and a United States district court has jurisdiction of a libel *in personam* against her owners and master to recover the penalty prescribed by section 4500.

This is a proceeding in admiralty, by information filed by the district attorney against the defendants *in personam*, charging them, as owners and master of the steamer John Taylor, with the violation of the laws of the United States regulating steam-vessels. That law provides in substance, among other things, that all passenger steam-vessels navigating any waters of the United States, etc., engaging in excursions, shall obtain from the inspector a special permit in writing for the occasion, in which the number of passengers that may be carried, and the number and kind of life-preservers, shall be stated, etc. The statute further prescribes a penalty of $500 for the violation of said provision. Rev. St. §§ 4400, 4466, 4500.

It is alleged in the libel that the said John Taylor was a boat propelled by steam, and that said steamer violated said provision, in the fact that she carried passengers largely in excess of the number allowed by her permit, and that she failed to carry the required number of boats and life-preservers. The defense set up is—*First*, that the boat, upon the excursion in question, carried citizens of the city of Burlington, Iowa, only, upon the Mississippi river from that city to another place in the state of Iowa, within the same county in which said city is situated, and that the transaction in question in nowise appertained to commerce with any other state than the state of Iowa, but that it was a transaction connected solely and exclusively with the domestic intercourse of said state; *second*, that the boat was not a passenger steamer, but a steam ferry-boat, plying between said city of Burlington and the Illinois shore, and that as such she is excepted from the penalty prescribed by the statute.

*John S. Runnells*, Dist. Atty., and *William T. Rankin*, for libelant.

*Newman & Blake*, for respondents.

LOVE, J. It thus appears that the boat in question was propelled by steam, and that she was engaged in navigating the Mississippi

river, carrying passengers from one place in the state of Iowa to another place in the same state. It does not appear that she was engaged in any interstate commerce whatever. "Commerce," says the supreme court of the United States in *Gibbons* v. *Ogden*, 9 Wheat. 1, "is more than traffic: it is intercourse;" and the carrying of passengers is commercial intercourse. The navigation in question was within a "water of the United States," as contradistinguished from "a water of the states;" but the commerce in which the boat was engaged was "completely internal" to the state of Iowa. Such being the facts, the counsel for the respondents contend that the case is not within the jurisdiction of the district court of the United States. It is necessary, in the decision of this case, to keep clearly in view the definition of the terms "waters of the United States," as given by the supreme court of the United States. In *The Daniel Ball*, 10 Wall. 563, the supreme court say that our rivers are "navigable waters of the United States, within the meaning of the acts of congress, in contradistinction from the navigable rivers of the states, when they form in their ordinary condition by themselves, or by uniting with other rivers, a continued highway over which commerce is or may be carried on with other states or foreign countries, in the customary modes in which commerce is conducted by water." Within this definition the court has held the Fox river, and also the Grand river, a small navigable stream wholly within the state of Michigan, flowing into Lake Michigan, to be a "navigable water" of the United States. See, also, *The Montello,* 11 Wall. 411, and particularly the same case, 20 Wall. 430. In *Ex parte Boyer*, 109 U. S. 629, S. C. 3 Sup. Ct. Rep. 434, the supreme court approved the *dicta* of these cases, and held that the Illinois and Michigan canal, though a water-way wholly artificial, is public water of the United States, and within the legitimate scope of the admiralty jurisdiction. It follows that a lake or river which is completely within the limits of a state, without any navigable outlet to any other state or country, is a navigable water of the state not within the jurisdiction of the federal government. It thus appears that the so-called waters of the United States include navigable streams without number; indeed, the whole river system of our country, where navigation exists with a flowage to the sea, or either directly or indirectly from one state to another. Now, suppose a boat or vessel to be plying between two ports in the same state upon any navigable water of the United States as thus defined, but engaged exclusively in the domestic commerce of the state, is she within the admiralty jurisdiction of the United States? Counsel insist that she is not. Is it, then, the character of the river, as a navigable water of the United States, or the particular kind of commerce in which the boat is engaged, that determines the jurisdiction? That the boat, in the case now before the court, was locally within the admiralty jurisdiction of this court, there is, of course, no doubt whatever, for she was afloat upon the Mississippi river. But counsel contend that the

"subject-matter" as well as the locality must be taken into account in determining the jurisdiction; that the boat in question was employed exclusively in the domestic commerce of the state of Iowa; that she was not, therefore, within the grant of power to congress to regulate commerce among the states, which is the only source of power in the constitution applicable to the case.

It will be seen, as we proceed, that the argument of counsel would have had great, perhaps conclusive, force, if it had been made prior to the decision of the supreme court in the case of *The Genesee Chief*, 12 How. 443, in the year 1851. That decision, it is well known, worked a great change in the jurisdiction of the federal courts with respect to cases growing out of the navigation of the rivers of the United States above tide-water. The effect of that decision will be presently considered.

In order to give jurisdiction to a federal court in any case whatever, the constitution and the statute law must concur. It is not sufficient that the jurisdiction may be found in the constitution *or* the law. The two must co-operate; the constitution as the fountain, and the laws of congress as the streams from which and through which the waters of jurisdiction flow to the court. This results necessarily from the structure of the federal government. It is a government of granted and limited powers. All powers not granted by the constitution to the federal government nor prohibited to the states are reserved to the states or the people. The great residuum of legislative, executive, and judicial power remains in the states. With respect to the federal government, the question always is, what powers are granted? with regard to the states, what powers are prohibited? There are in the federal constitution two distinct and independent provisions touching the subject of navigation and commerce. Article 1, § 8, as follows: "Congress shall have power to regulate commerce with foreign nations, and among the several states and among the Indian tribes," etc. Article 3, § 2: "The judicial power shall extend to all cases of admiralty and maritime jurisdiction," etc.

For more than 50 years after the organization of the American courts it was the received doctrine that admiralty jurisdiction was limited to tide-water. This doctrine was inherited with the law of admiralty from the mother country. It received the sanction of the supreme court of the United States in the year 1825, in the case of *The Thomas Jefferson*, 10 Wheat. 428. The flow of the tides is well adapted to measure the necessity of admiralty jurisdiction in England, where navigation and tide-water are practically co-extensive. But with the vast expansion of commerce by steam navigation upon our great tideless lakes and far-flowing rivers, it became in time apparent that the flux and reflux of the tides as a test of admiralty jurisdiction was wholly unsuited to the necessities of commerce and navigation in this country. It was like an attempt to clothe a giant

with garments adapted to the form of a dwarf. Hence the decision of the supreme court of the United States in *The Genesee Chief*, 12 How. 452. This decision was rendered in 1851. It wholly over-ruled *The Thomas Jefferson*, and established the doctrine that hence-forth navigability, not tide-water, was to be the true test of admiralty jurisdiction in this country. The result of this decision was to ex-tend the admiralty jurisdiction of our courts over all the navigable waters of the United States. The court, in this case, also distinctly repudiated the doctrine that admiralty jurisdiction depends upon the commercial power of the constitution. The court say:

"Nor can the jurisdiction of the courts of the United States be made to de-pend on regulations of commerce. They are entirely distinct things, having no necessary connection with one another, and are conferred in the constitu-tion by separate and distinct grants." See 12 How. 452.

It is manifest that prior to the decision in *The Genesee Chief* there was *apparently* but one source of federal jurisdiction over commerce and navigation above tide-water, namely, the power of congress to regulate commerce among the states. The supreme court, in *Gib-bons* v. *Ogden*, 9 Wheat. 217, held that navigation is necessarily in-volved in maritime commerce, and therefore that congress was fully competent to pass laws regulating the navigation of vessels engaged in interstate commerce; but the court traced the power to regulate navigation to the power to regulate commerce. The court at the same time held that the power to regulate interstate commerce does not comprehend that commerce which is completely internal to the states. It is a necessary inference that congress had no power, as the law was understood prior to the decision in question, to regulate navigation above tide-water when it was concerned exclusively with the domestic commerce of the states, even when the vessel carrying it on was afloat in the navigable waters of the United States. But whoever will take the pains to examine the decisions of the supreme court subsequent to *The Genesee Chief* will find a marked change in the course of judicial thought in that tribunal with respect to nav-igation above tide-water. It is apparent that a new source of juris-diction above tide-water was discovered. It became necessary to take into view the clause of the constitution extending the judicial power of the United States to all questions of admiralty and mari-time jurisdiction. The result, in my opinion, is that, navigability being the test of admiralty jurisdiction, the true doctrine now is that the admiralty jurisdiction extends to all vessels navigating the waters of the United States, as contradistinguished from the waters of the states, whatever may be the character of the commerce in which they are engaged, whether foreign, interstate, or completely internal to the states. All admiralty jurisdiction refers directly or indirectly to nav-igation. It is the vessel and its navigation, and the crimes, torts, and contracts growing out of it, that form the objects of admiralty juris-diction. Commerce is only so far an object of admiralty jurisdiction

as it is connected incidentally with navigation. The admiralty has nothing whatever to do with commerce upon land; but it deals extensively with navigation for purposes entirely disconnected from commerce. Hence the law of admiralty was anciently called the law of the sea. That, with its present extension, would be a misnomer. It ought to receive a new baptism as the law of navigation and maritime commerce; navigability, not salt water, being now locally the test of its existence.

The law of congress having, in concurrence with the constitution, conferred upon the district courts original cognizance of "*all* cases of admiralty and maritime jurisdiction," it is material to inquire what are in general *cases* of admiralty and maritime jurisdiction. The general jurisdiction of the admiralty embraces maritime contracts, torts, and crimes. Crimes committed within the jurisdiction of the states being expressly excepted from the jurisdiction of the federal courts by the crimes act, we have no present concern with that class of cases. Rev. St. § 5339. The civil jurisdiction of the admiralty includes all marine contracts and torts. The subject-matter is the test of a marine contract. A contract appertaining to commerce and navigation, wherever made, to be performed on the navigable waters of the United States, is in general a marine contract. But with respect to marine torts the test is locality. This doctrine is settled by authorities too numerous for citation. *The Belfast*, 7 Wall. 637; *The Commerce*, 1 Black, 574; 2 Pars. Shipp. & Adm. 347. A marine tort certainly cannot be made to depend upon the kind of commerce in which the ship is employed. If a marine tort be committed anywhere upon a navigable water of the United States, whether the ship or vessel be engaged in commerce wholly domestic to a state or interstate, the case is one of admiralty and maritime jurisdiction. *The Commerce*, 1 Black, 570. See what is said by CLIFFORD, J., in delivering the opinion in *The Belfast, supra*, 670; and by Chief Justice CHASE in *The Mary Washington*, 5 Amer. Law Reg. 647, at bottom of page. See, also, *The Magnolia*, 20 How. 296. Suppose a collision of two vessels on the Missouri river, within the limits of that state, both employed in the strictly domestic commerce of the state, or one in such domestic commerce and the other in commerce with other states; would not the tort in either case be within the admiralty? Certainly; because the tort is marine, and the locality—the Missouri river— is within the admiralty jurisdiction of the United States.

Neither is the kind of commerce carried on by the vessel, whether interstate or intro-state, any test of a maritime contract. *The Belfast, supra.* In this case it was decided that a contract of affreightment for the transportation of cotton from a port in one state to a port in the same state is a maritime contract within the admiralty. The same was held in *The Mary Washington, supra.*

The general question is whether or not the vessels navigating the waters of the United States, but carrying on domestic trade of a state

exclusively, are within the scope of the admiralty jurisdiction? If, under such circumstances, the federal admiralty jurisdiction does not extend over the navigable waters of the United States to all cases of contract and tort growing out of the kind of commerce and navigation indicated, the suitor must be remitted for redress to the common-law jurisdiction of the local courts; for there is and can be no admiralty jurisdiction whatever, other than that of the United States, applicable to such cases. It is settled by many cases that the admiralty jurisdiction of the federal courts is exclusive, and that all state laws creating maritime liens, or jurisdiction *in rem* to enforce such liens, are unconstitutional and void. *The Moses Taylor*, 4 Wall. 411; *The Hine* v. *Trevor*, Id. 555; *The Belfast*, 7 Wall. 624; *The Lottawanna*, 21 Wall. 558. So strong is this principle of exclusive jurisdiction that it is now settled by *The Lottawanna* and other cases that where state laws create liens upon the boat not strictly maritime and within the admiralty,—such, for example, as a lien upon the boat for supplies in her home port,—the federal admiralty will recognize and enforce them, and that no state court can be clothed with power to enforce such liens by proceedings *in rem*. Thus the state courts are not only impotent to enforce general maritime liens, but they are equally inadequate to the duty of enforcing, by proceedings *in rem*, liens created upon the vessel by the legislative power under which they sit to administer justice.

Again, the admiralty jurisdiction above tide-water now stands upon exactly the same footing as the admiralty jurisdiction below tide-water and upon the sea-coast. The decision in *The Genesee Chief* has worked this result. If, therefore, the admiralty jurisdiction upon our rivers above the flux of the tides be excluded where the vessel, though floating in the waters of the United States, is engaged in strictly domestic commerce, I can see no good reason why it may not on the same ground be excluded upon the sea-board within the borders of the states, in cases where the vessel is employed in a commerce completely internal to the states. But no one, I think, would contend that a doctrine leading to such a result could be maintained. It is startling to think of the mischievous consequences of excluding all admiralty jurisdiction from so large a class of cases as must inevitably grow out of strictly domestic state commerce, upon the vast stretches of navigable water, both of the sea-coasts and lake and river shores, and remitting the parties for redress to the wholly inadequate remedies of the common law touching maritime injuries. For if, in such cases, the admiralty jurisdiction be excluded, the only remedies upon marine torts and contracts would be by actions *in personam* at common law, and by proceedings in attachment under the state statutes.

But, assuming that the class of cases just referred to is within the cognizance of the admiralty, it may be questioned whether or not the very case now before the court is one of admiralty and maritime

jurisdiction. The present case is a marine tort. It grew out of a transaction in the navigation of a vessel upon the Mississippi river in violation of an act of congress, which makes it an offense, and subjects it to a pecuniary penalty. It bears the test of all marine torts—locality.

The present case is, in my judgment, identical in principle with *The La Vengeance,* 3 Dall. 297. That case was, like the present, prosecuted by *ex officio* information, in the district court, against the French schooner La Vengeance, alleging that certain arms and ammunition were exported in that schooner, contrary to the act of May 22, 1794. The only question made was whether or not it was a civil cause, and a cause of admiralty and maritime jurisdiction. The court said they were perfectly satisfied that, in the first place, it was a cause of admiralty and maritime jurisdiction; that the exportation of arms and ammunition was simply the offense; and the exportation was entirely a water transaction. It commenced at Sandy Hook, which must have been upon the water. In the next place, the court was unanimous that it was a civil cause; it was a process in the nature of a libel *in rem,* and does not in any degree touch the person of the offender. The questions decided here were vital; because, if it was not a cause of admiralty and maritime jurisdiction, or not a civil cause, the trial must have been by jury; whereas, the court below decreed a forfeiture, sitting without a jury. "The point in this case," says Mr. Justice NELSON, delivering the opinion in *The Eagle,* 8 Wall. 26, "was contested in several subsequent cases, but the court adhered firmly to its first decision." *The Daniel Ball, supra,* was also, in principle, like the present case. It was a proceeding *in rem* to enforce penalties affixed by an act of congress for the violation of the act requiring the master or owner of the boat to take out license, etc. The court gave judgment against the boat, and must, therefore, have treated the penalty as a maritime lien upon the vessel. It is true that *The La Vengeance* and *The Daniel Ball* were cases of seizure. The proceeding in those cases was *in rem;* in the present case it is *in personam.* That, however, can make no difference in the question of jurisdiction. It is not by the form of the proceeding, but by the nature of the case, and the locality of the injury, that we must determine whether a tort is of common law or admiralty jurisdiction. In many cases in admiralty, where liens exist, the proceeding may be *in personam* or *in rem,* or in both simultaneously. Ben. Adm. §§ 204, 361, 362; Admiralty Rules 13, 14, 15; *Manro* v. *Almeida,* 10 Wheat. 473. All seizures upon land, for the violation of the revenue laws, are proceedings *in rem* after the course of the admiralty. All such cases are, nevertheless, common-law causes, triable by jury. The fact of seizure, therefore, is not decisive in determining the jurisdiction.

But counsel say that, even conceding that the admiralty jurisdiction extends over all the navigable waters of the Union, "it must be con-

fined to cases arising under the constitution; that is, that ' the thing charged must not only occur on navigable water, but the transaction itself must be one which the government has, under the constitution, the right to regulate.' " The inference is that congress, under the power to regulate commerce among the states, has no authority to regulate navigation concerned exclusively with the domestic commerce of the states. The burden of this argument is that the power to pass laws regulating navigation is derived solely from the power to regulate commerce, and that where the vessel, though engaged in navigation upon the waters of the United States, is employed exclusively in the internal commerce of a state, the power of congress is not applicable to her navigation. This argument, I think, entirely confounds navigation with commerce, and ignores the fact that the former may exist as a thing entirely distinct from the latter. Moreover, it leaves out of view the consideration that the power of congress over navigation may be derived from the double sources of the commercial power and the admiralty power; in some cases from one power, and in other cases from both. Vessels may navigate the waters of the Union for the purpose of pleasure simply, or for warlike ends, or in the course of mere trial trips without the least view to commerce. In such cases there would be navigation without commerce, and would not the power of congress extend to the subject of their navigation as such? The power of congress to regulate navigation, therefore, is not wholly derived from the power to regulate commerce. There are other sources of legislative authority over the subject of navigation. May not the admiralty power be invoked as one of the sources of legislative authority over navigation in the public waters of the United States, whether it be concerned with foreign commerce or interstate commerce, or the strictly domestic commerce of the states, or trips for pleasure or trial trips? What are the subject-matters of admiralty jurisdiction? Maritime contracts, torts, and crimes; contracts to be performed and torts and crimes committed upon water in the course of or in connected with navigation. The constitution commits to a branch of the general government power over all cases of admiralty and maritime jurisdiction. May not congress, within the scope of this power, change, alter, or amend the law of marine contracts, torts, and crimes? May not congress, by virtue of the admiralty power, define anew what shall constitute a tort or crime in the navigation of a vessel upon the waters of the Union? Congress has in fact created numerous offenses against the laws of the United States upon the subject of "impost *navigation* and trade," which, when committed upon water in the course of navigation, fall within the admiralty jurisdiction. This has been the course of legislation from the earliest period of the government to our own day. Navigation is a special object of admiralty and maritime jurisdiction. Is not the national legislature competent under the admiralty power to declare what cases connected with navigation are of admiralty jurisdiction, and to create offenses

within that jurisdiction? *The La Vengeance, The Daniel Ball, supra.*
In both of these cases penal offenses were created by the legislation
of congress.

It may be said that marine commerce includes navigation, and
therefore that congress may derive authority to pass navigation laws
through the power to regulate commerce among the states. It is
true that maritime commerce implies navigation, but not all kinds of
navigation. If we deduce the authority of congress to regulate navi-
gation exclusively from the power to regulate commerce, we must
confine it to commerce with foreign nations, among the states, and
with the Indian tribes. But since congress has power to regulate
some kinds of navigation not within that category, we cannot deduce
its legislative authority wholly from that source. Legislative author-
ity in congress may, in some instances, be derived from more than
one grant in the constitution, as a river may receive its waters
through streams flowing from different sources. Thus the authority
to build and equip vessels of war is, doubtless, implied in the power
to "declare war," but the same authority is more directly conferred by
the power to "provide and maintain a navy."

The question is whether or not congress has, under the constitu-
tion, power to regulate by law the navigation of boats and vessels
floating in the navigable waters of the United States, when engaged
exclusively in the domestic commerce of the states. The respondent's
counsel answer this question in the negative, on the ground that the
power of congress is restricted to the regulation of commerce among
the several states. If the power of congress is not full and plenary
over navigation in all the waters of the United States and over all
vessels carrying on commerce upon the same, whether foreign, coast-
wise, interstate, or strictly domestic to the states, a disastrous con-
flict must occur, both legislative and judicial. If the respondent's
counsel be right in their position, congress has power to regulate one
class of vessels and the states another class navigating the same wa-
ters side by side. In order to determine the law and the jurisdiction
it would be necessary in every case to first ascertain in what kind
of commerce the vessel is engaged. Congress would have the un-
doubted right to prescribe rules and regulations for the navigation of
vessels carrying on commerce among the states and afloat upon the
waters of the United States. The states, upon the respondent's the-
ory, would have power to regulate the navigation in the same waters
of water-craft engaged in their strictly domestic commerce. The fed-
eral government might prescribe one set of rules and regulations; the
state government, a different set of rules and regulations. By one au-
thority certain signals for the safety of navigation might be prescribed;
by the other, different signals for the same emergency. One legisla-
tive power might, in a given situation, give the ascending boat the
channel; the other, the descending boat. One government might lay
down a rule for steam and sail vessels passing each other, in conflict

with the rule prescribed by the other. In short, the conflict of rules for the safe navigation of water-craft carrying passengers and property in the narrow water-ways of our numberless rivers and artificial channels of commerce would be infinite, unless the power of the states be excluded and that of the federal government be made full and plenary over the navigable waters of the United States. It is needless to dwell upon the mischiefs likely to result from a conflict of rules and regulations. They would be simply intolerable.

All that is here said applies with equal force to the power of congress to regulate navigation upon the sea-coast and lake shores within the limits of the states by vessels engaged in strictly domestic commerce of the states. The power of congress must be exactly the same over navigation above and below tide-water. It is quite certain that the navigation laws of the United States are now framed upon the assumption of the plenary power of congress over the subject of navigation upon the waters of the United States, without reference to the question of intro-state or interstate commerce. See, for illustration, the Revised Statutes. Wherever navigation exists which may carry the vessel beyond the limits of a state into another jurisdiction, there is a necessity for admiralty jurisdiction to establish and enforce the lien of parties who may furnish the vessel in the state from which she may escape. Hence, everywhere upon the navigable waters of the United States, as defined in *The Daniel Ball,* the admiralty jurisdiction is a public necessity. But where navigation exists upon the waters of a state with no outlet—as upon a land-locked lake or river flowing into the same—there is no need of admiralty jurisdiction, since the vessel cannot escape from the state jurisdiction. She is always necessarily in her home port, and the process of the local law could reach her owners. Hence, neither the admiralty lien nor the proceeding *in rem* to enforce it would be required.

I am aware that defendants' counsel have some warrant for their position in the cases cited by them in the argument. It will be seen, however, by an examination of the cases, that their authorities consist of *dicta* disapproved, or cases overruled by the supreme court of the United States in later decisions. The defendants' counsel rely upon the following cases: *The Bright Star,* Woolw. 267; *Allen* v. *Newberry,* 21 How. 245; *Maguire* v. *Card,* 21 How. 248.

Neither *The Bright Star* nor *Allen* v. *Newberry* are in point here. Both of these cases turned upon the construction of acts of congress which in express terms limited the jurisdiction to cases, one of tort and the other of contract, growing out of commerce between different states and territories. The decision in *The Bright Star* turned upon the fourth section of the act of 1864, (13 St. at Large, 120,) requiring the inspection of vessels "engaged in commerce among the states." As the Bright Star was charged with the alleged offense while engaged exclusively in the domestic commerce of the state of Missouri, Mr. Justice MILLER held that she was not within the terms of the

statute. *Allen* v. *Newberry* is still less in point. It was decided upon the act of 1845 relating exclusively to lake commerce. It has been held over and over again that the act of 1845 has no application whatever to our river commerce. It restricts the jurisdiction to commerce and navigation between ports and places in different territories. That case was therefore clearly not within the terms of the statute. See what CLIFFORD, J., says in *The Belfast,* (a later case,) 7 Wall. 641, showing clearly that *Allen* v. *Newberry* is not in point here, and disapproving of the remarks of the judge in that case. See, also, Chief Justice CHASE in *The Mary Washington,* 5 Amer. Law Reg. (N. S.) 695, 696; also *The Commerce, supra.*

*Maguire* v. *Card* was a case *in rem* for supplies to the vessel in her home port. This was a conclusive ground against the libelant, because the admiralty then recognized no lien upon a vessel for supplies in her home port. Judge NELSON put the case upon this ground, and also upon the ground that a contract of affreightment between ports of the same state is not within the admiralty, because the jurisdiction of such cases grows out of the power to regulate commerce among the states. This latter doctrine was expressly denied and overruled in the subsequent case of *The Belfast,* and virtually in *The Commerce, supra,* 578, 579. See what Chief Justice CHASE says about it in *The Mary Washington, supra;* and the *resume* of CLIFFORD, J., in *The Lottawanna,* 21 Wall. 586, commencing at the last paragraph on that page,—showing beyond question that the present doctrine of the supreme court is that the admiralty jurisdiction is not affected by the commerce power, and that it attaches to marine contracts and torts in strictly internal state commerce, where the navigation is upon the waters of the Union.

The case at bar depends upon statutes totally different from the acts of 1845 and 1864. It proceeds upon the act regulating steam-vessels, passed originally in 1871, and found substantially in the Revised Statutes of 1878, c. 1, p. 852, § 4400. Instead of confining the offense to vessels carrying on commerce between different states, it provides that "*all* steam-vessels navigating *any* waters of the United States" shall be within the requirements and penalties of the act.

As to the point that the Taylor was a ferry-boat, and not a passenger boat, it is conclusively answered by Judge MILLER in *The Bright Star,* on page 271, Woolworth. A ferry-boat, when she turns aside from her proper business to carry passengers on excursions, ceases *quoad hoc* to be a ferry-boat. She, as to that trip or voyage, becomes, to all intents and purposes, a passenger boat. It would be the veriest evasion of the law, and its purpose of safety to passengers, to permit a ferry-boat to carry passengers on excursions, and escape under the privilege of a ferry-boat.

Exceptions to answer sustained.

See *The Gretna Green,* 20 FED. REP. 901.—[ED.