## *In re* GARNETT AND OTHERS.

ORIGINAL.

No. 10.   Original.   Argued March 9, 10, 1891. — Decided May 25, 1891.

The law of limited liability is part of the maritime law of the United States, and is in force upon navigable rivers above tide water, and applies to enrolled and licensed vessels exclusively engaged in commerce on such a river.

ON the 2d of February, 1891, leave was granted to *Mr. Walter Van Rensselaer Berry* to file the petition of Garnett, Stubbs & Co. and several others for a writ of prohibition to prohibit the judge of the District Court of the United States for the Eastern Division of the Southern District of Georgia from proceeding with a suit in admiralty in that court, in which John Lawton, owner of the steamer Katie, had libelled that vessel and summoned the petitioners as defendants. Leave was granted, and the petition was filed, to which was attached a copy of the libel.

It appeared that the Katie was a steamer engaged in the carrying trade between Augusta on the Savannah River and Savannah, on the same river, both in the State of Georgia; that in October, 1887, she received from the various peti-

tioners, and from various points along the river, cotton to be transported for each petitioner; and that while making the voyage she took fire and some of the cotton was burned, and other bales were thrown overboard. The owners or consignees of the cotton which had been damaged or lost brought suits against Lawton, as a common carrier, to recover in each case, its value. There were ten actions in all, and their aggregate claims were about sixteen thousand dollars.

Thereupon Lawton filed the libel in question alleging, as set forth in the petition, "that the amount sued for in said cases, and the loss and damage happening by means of or by reason of said fire, exceeded the value of said steamboat and her freight on said voyage, and that said fire was not caused by any negligence of said libellant or of the master and crew of said steamboat, and that under the act of Congress, approved March 3, 1851, as amended by the act of Congress, approved June 19, 1886, said libellant was not in any wise liable for said loss or damage; and claiming further, in the event of any liability, the benefit of the limitation provided in the third and fourth sections of said act of March 3, 1851, a copy of said libel and its 'Exhibits' being hereunto annexed."

The petition further alleged "That afterwards, to wit, on the 8th day of March, 1888, an appraisement of said steamboat and freight was had, said steamboat being appraised at $3300 and the freight at $196.75, making a total of $3496.75, for which said sum the said John Lawton entered into the usual stipulation on May 4, 1889."

From the answer of the district judge it appeared that the defendants in the admiralty suit had demurred to the libel and had moved to dismiss the same "because the fourth section of the act of Congress approved June 19, 1886, is alleged to be unconstitutional;" and that the court had overruled the demurrer, and dismissed the motion, and ordered the cause to proceed.

This fourth section is as follows: "Section 4. That section 4289, of the Revised Statutes, be amended so as to read as follows: 'Section 4289. The provisions of the seven preceding sections and of section eighteen of an act entitled "An act to re-

move certain burdens on the American merchant marine, and to encourage the American foreign carrying trade, and other purposes," approved June twenty-sixth, eighteen hundred and eighty-four, relating to the limitations of the liability of the owners of vessels, shall apply to all sea-going vessels, and also to all vessels used on lakes or rivers, or in inland navigation, including canal-boats, barges and lighters.'" 24 Stat. 80, 81.

*Mr. Samuel B. Adams* for the petitioner.

I. Our main contention is that the words here used are none of them limited, as an act of Congress must be in order to be valid; even if the validity of such legislation is not confined to the commerce clause of the Constitution, and may be supported by the clause touching the admiralty and maritime jurisdiction of the courts of the United States, and even although this act can be regarded as simply a regulation of the vessel itself.

We must bear in mind that we are not attacking an act of a State, where the legislature has all the powers except those prohibited, but an act of Congress, concerning whose powers it has been properly said in Potter's "Dwarris on Statutes and Constitutions," pages 367 and 368: "When those powers are questioned, the only duty of the court is to see whether the grant of specific powers is broad enough to embrace the act." To the same effect are the decisions of this court in *Martin* v. *Hunter's Lessee,* 1 Wheat. 304, 326; *Trade Mark Cases,* 100 U. S. 82, 93; and in *Gilman* v. *Philadelphia,* 3 Wall. 713, 725, 726.

In the *Trade Mark Cases* this court, in holding that the words "any person or firm" were too broad, uses this clear and emphatic language, "When, therefore, Congress undertakes to enact a law which can only be valid as a regulation of commerce, it is reasonable to expect to find, on the face of the law, or from its essential nature, that it is a regulation of commerce with foreign nations, or among the several States, or with the Indian tribes. If not so limited it is in excess of the power of Congress."

We fully recognize the familiar principle that a law may be constitutional in part and bad in part. Under this principle the words " sea-going vessels," covering maritime commerce, may be saved because they are capable of separation from the rest of the clause; but the courts never change, limit or restrict (which would change) the natural and obvious meaning of words so as to amend the statute into harmony with the fundamental law. If the words used are susceptible of two constructions, one that will harmonize the law with the Constitution, and another which will bring it into hostility, the courts will adopt the former construction. But when the words used are clear and unambiguous, and these words evince an unconstitutional exercise of power, the courts cannot save the law. One of the main purposes of the law as it previously stood, (although the excepting clause was more comprehensive than the necessities of this purpose demanded,) was to save internal commerce from the operation of the limited liability sections. And it seems to us clear that one of the main purposes of the amendment was to include this internal commerce. Whether this was a controlling purpose or not, every word used which can in any wise be applied to the case at bar, is broad enough to necessarily cover every form of internal commerce carried on by water, and every form of craft, no matter how insignificant its draft, and no matter how exclusively local and humble its business. This court will be asked, in order to save the law, that it limit this act of 1886 to the constitutional limitations of Congress, when the purpose of the law is that it be unlimited and unrestricted. If this act be good, there is no limit to the power of Congress in the regulation of commerce. The Constitution does not restrict it to water, and therefore it can pass an act limiting ever so radically the liability of a common carrier anywhere, no matter how thoroughly internal and local its business. *The Genesee Chief*, 12 How. 443, 452; *Pensacola Tel. Co.* v. *Western Union Tel. Co.*, 96 U. S. 1, 8, 9.

If this law can find support in the admiralty and maritime jurisdiction clause, then, we repeat, it is still, in all of the terms that are germane, entirely too broad, unless this court

can hold that this jurisdiction covers all localities where it chances to be a "little damp," and, under the guise of jurisdiction, the United States courts can be given the power to practically destroy the rights of citizens who are compelled to patronize ships.

Wherever it is applicable, the law was radical enough before. Under the decision of the majority of this court, in *Providence and New York Steamship Co.* v. *Hill Manufacturing Co.*, 109 U. S. 578, in the case of loss happening by fire, the owner of the ship is not liable at all unless the neglect was shown to be his own personal neglect, and even then, his liability is confined to his interest in the ship.

On account of the importance of the proposition that "it is not within the judicial province to give to the words used by Congress a narrower meaning than they are manifestly intended to bear" in order to save an act from the objection of unconstitutionality, we refer, in addition to the *Trade Mark Cases*, to the following: *United States* v. *Reese*, 92 U. S. 214, 220, 221; *Virginia Coupon Cases*, 114 U. S. 269, 304, 305 (a civil case which applies the principle recognized in the *Trade Mark Cases*, and in *United States* v. *Reese*); *Spraigue* v. *Thompson*, 118 U. S. 90; *Allen* v. *Louisiana*, 103 U. S. 80; *State Tonnage Tax Cases*, 12 Wall. 204, 217, 219; *Leloup* v. *Port of Mobile*, 127 U. S. 640, 647; and *Lord* v. *Steamship Co.*, 102 U. S. 541.

II. The commerce clause of the Constitution, upon which we submit this legislation must be based, and to which the decisions of this court and of other United States courts refer such legislation for its sanction, not only does not authorize, but it prohibits any act by Congress broad enough to control or regulate internal commerce or traffic between citizens of the same State. This clause was intended to place such commerce beyond its control. See *Veazie* v. *Moore*, 14 How. 573 *et seq.*; *Gibbons* v. *Ogden*, 9 Wheat. 194, 195; *Moore* v. *American Transportation Company*, 24 How. 37 and 39; *The Daniel Ball*, 10 Wall. 564, 565; *The Trade Mark Cases*, 100 U. S. 95 *et seq.*; *Lord* v. *Steamship Company*, 102 U. S. 543; *Sands* v. *River Company*, 123 U. S. 295.

III. Authority for this legislation cannot be found in the clause providing that the judicial power shall extend to all cases of admiralty and maritime jurisdiction.

We admit that the jurisdiction of the admiralty court is not circumscribed by the commerce clause; that the courts may try cases involving vessels engaged in purely internal commerce, and questions appertaining to such commerce. But this affects only the *forum*. It does not concern the substantial rights of the parties.

A shipowner entitled to the benefits of the limited liability act of 1851, need not go into a court of admiralty at all; his rights are secured independently of the tribunal. He may assert them by a plea to a common law action in any court. See *The Scotland*, 105 U. S. 33, 34. Generally it will be found that the remedies of the District Court are more full and complete, but the shipowner is not confined to this court, and his rights are the same in any tribunal. If this be so, the correlative rights of his patrons ought to be the same, no matter in what tribunal they may be adjudicated.

Other cases, in addition to those heretofore cited, hold that the validity of this legislation depends upon the commerce clause. See *The War Eagle*, 6 Bissell, 366; *Lord* v. *Steamship Co.*, 4 Sawyer, 292; *The Mamie*, 5 Fed. Rep. 821; the same case is affirmed in 8 Fed. Rep. 367; *American Transportation Co.* v. *Moore*, 5 Michigan, 392 and 393; *Headrich* v. *Virginia &c. Railway Co.*, 48 Georgia, 549.

If, then, this legislation can be separated from its effect upon the traffic rights and obligations of the parties concerned, and can be confined to a mere regulation of vessels, we insist that no authoritative decision can be found which will sustain the validity of a law of Congress requiring a vessel engaged solely in internal commerce, and entirely disconnected from interstate or foreign commerce, to be licensed, or which otherwise regulates such a vessel. Many can be cited against this power of Congress, and some of the decisions hereinbefore discussed are in point on this branch of the case.

In *Gibbons* v. *Ogden*, in discussing the power of Congress

over navigation, under the commerce clause, the court limits it to that which is in some manner connected with foreign nations or among the several States, or with the Indian tribes. 9 Wheat. 1, 197.

In the *Passenger Cases*, 7 How. 283, 400, Mr. Justice McLean says: "If Congress should impose a tonnage duty on vessels which ply between ports within the same State, or require such vessels to take out a license, or impose a tax on persons transported in them, the act would be unconstitutional and void."

In *Sinot* v. *Davenport*, 22 How. 227, this court held that an act of the State of Alabama, which was broad enough to regulate vessels under the control of Congress was void, but in treating of the control of Congress over ships, the court, on page 243, recognizes the limitation contended for by us, a limitation which the act of 1886 not merely ignores, but proposes to repudiate.

The case of *The Bright Star*, 1 Wool. C. C., is very much in point. The question decided by Mr. Justice Miller was whether she was compelled to take out a license, and was under the inspection laws. This question had been determined in the negative by the judge of the District Court, and his decision was, on appeal, affirmed in a full and exhaustive opinion. Mr. Justice Miller holds that it is not in the power of Congress to regulate vessels confined to internal commerce, and "that Congress has in its legislation steadily kept this in view." See also *The Oconte*, 5 Bissell, 463; *The War Eagle*, 6 Bissell, 366. In *The Thomas Swan*, 6 Ben. 42, Judge Blatchford approves and follows Judge Miller's opinion, holding that *The Thomas Swan* does not fall within the principle of *The Daniel Ball*, *ubi supra*. See also *Gilman* v. *Philadelphia*, 3 Wall. 557, cited by Judge Miller in 1 Woolworth.

IV. In conclusion, we submit what we have heretofore incidentally noticed, that if this legislation can be based upon the jurisdictional clause of the Constitution, and if the commerce clause can be expunged, yet still it cannot be constitutional. In any event, in order for the courts of the United States to have jurisdiction, the waters must be navigable

waters of the United States which, as already noticed, are waters which by themselves, or by their connection with other waters, form a continuous channel for commerce among the States, or with foreign countries. See *The Genesee Chief*, 12 How. 443; *Allen* v. *Newberry*, 21 How. 244; *The Hine* v. *Trevor*, 4 Wall. 555; *The Belfast*, 7 Wall. 624; *Steamer St. Lawrence*, 1 Black, 522; *Butler* v. *Boston Steamship Co.*, 130 U. S. 527.

*Mr. R. G. Erwin* opposing.

MR. JUSTICE BRADLEY delivered the opinion of the court.

This is a petition for a writ of prohibition to be directed to the judge of the District Court of the United States for the Eastern Division of the Southern District of Georgia, to prohibit said judge from taking further cognizance of a certain suit instituted before him in said court. The suit sought to be prohibited is a libel filed in said court by John Lawton, owner of the steamboat Katie, seeking a decree for limited liability for the loss and damage which accrued by fire on said steamboat in the Savannah River on the 12th of October, 1887. A copy of this libel is annexed to the petition for prohibition. It sets out the facts that Lawton was the owner of the steamboat; that she was an enrolled vessel of the United States, duly licensed to carry on the coasting trade; that she had for twenty years been engaged in transporting merchandise, goods and commodities from and to the ports of Savannah and Augusta, and intermediate ports and landings on the Savannah River, in the States of South Carolina and Georgia; and that some of the said goods were transported by said steamboat as one of the through lines of carriers, issuing through bills of lading to and from ports and places within the State of Georgia, and ports and places in other States of the United States and foreign countries.

The libel then states that on the 8th of October, 1887, the said steamboat left Augusta for Savannah and intermediate places on the river in South Carolina and Georgia, intending to load a cargo chiefly of cotton, being properly manned and

equipped; that on the 10th day of October, having then on board 643 bales of cotton, she left a landing called Burton's Ferry, and shortly after struck on a sand bar, and notwithstanding the utmost endeavor of master and crew, remained there till October 12th, when fire was discovered in the cotton near the bow of the steamboat; that the fire spread with great rapidity, and some of the bales of cotton had to be thrown overboard to prevent it from spreading more; and after three hours of the hardest and most hazardous work, the master and crew succeeded in clearing the bow of the burning cotton, and saving the vessel and a portion of the cargo, but leaving the vessel much burned and damaged. A list of the cargo was attached to the libel, which proceeded to state that nearly all of the consignees of the cotton lost or damaged had brought suits against the libellant; and a list of the suits was also appended to the libel, in two of which attachments were issued; that the amount thus sued for, and the loss and damage happening by means of said fire, exceeded the value of the said steamboat and her freight on said voyage; that the fire was not caused by any negligence of the libellant, or of the master and crew, and that by reason of the exception against fire contained in the bills of lading and receipts, the libellant was not liable for the loss and damage caused by said fire; that libellant did not know the cause of the fire nor had any information as to the cause, not being on board of the vessel at the time; and that all the loss, destruction and damage to the bales of cotton happened by means of said fire, and that said fire was not caused by the design or neglect of the libellant, but was solely caused without his privity or knowledge.

After an allegation that the Savannah River is a navigable stream lying partly in Georgia and partly in South Carolina, and that the contracts for carrying the cotton were maritime contracts, the libellant proceeded to contest his entire liability, under the act of Congress in that behalf, and under the bills of lading; and if he should be held liable he claimed the benefit of limited liability. The libel concluded with the usual prayer for appraisement of the vessel, and a monition to all persons claiming damages to appear, etc.

The petitioners, who now come to this court for a prohibition, allege that they are cotton factors and commission merchants, residing and doing business in Savannah, and that they were the consignees of the cotton constituting the cargo of the said steamboat, except a few bales. They state that the said steamboat was engaged exclusively in inland navigation of the Savannah River, between the ports of Augusta and Savannah and intermediate ports and places on either side of the said river, and that she was not a sea-going vessel. They further state the various suits brought by them, respectively, namely, ten different suits, mostly in the city court of Savannah, for different sums, amounting in the aggregate to nearly sixteen thousand dollars; and that in all of said suits, except two attachments, personal service was made on the said Lawton, the owner of said steamboat. The petitioners further state the filing of the said libel, and that an appraisement of the steamboat and freight had been made, amounting to a total of $3496.75, for which sum the said Lawton had entered into the usual stipulation. They further state that afterwards, on the 9th of April, 1888, they objected to the said District Court taking further cognizance of the case, and moved to dismiss the libel on the grounds that the said court was without jurisdiction in the premises, and that the 4th section of the act of Congress, approved June 19, 1886, on which the said action was based, is unconstitutional and void; but that the said court overruled the said motion and determined to proceed with the further cognizance of the cause. The petitioners further state, and rely upon the fact, that the greater part of the cotton was shipped by Georgia consignors, from divers points or places within the State of Georgia, to be transported to Savannah, Georgia, to consignees who were residents and citizens of Savannah, and was the subject of a commerce strictly internal.

The act of Congress to which the petitioners refer as being the act on which the libel of Lawton was based, and which they contend is unconstitutional and void, is the 4th section of the act approved June 19, 1886, entitled, "An act to abolish certain fees for official services to American vessels, and to

amend the laws relating to shipping, commissioners, seamen and owners of vessels, and for other purposes." 24 Stat. 79. By the section referred to, section 4289 of the Revised Statutes was amended so as to read as follows: "Sec. 4289. The provisions of the seven preceding sections, and of section eighteen of an act entitled 'An act to remove certain burdens on the American merchant marine and encourage the American foreign carrying trade, and for other purposes, approved June 26, 1884, relating to the limitations of the liability of the owners of vessels, shall apply to all sea-going vessels, and also to all vessels used on lakes or rivers or in inland navigation, including canal-boats, barges and lighters.'" The purport and effect of this section is apparent from an inspection of the original limited liability act passed March 3, 1851. 9 Stat. 635, c. 43. After exempting ship owners from liability for loss or damage occasioned by fire on board of their ships, happening without any design or neglect of theirs; and for loss of precious metals or jewelry of which they or the masters of their vessels have not received written notice; and declaring that their liability shall in no case exceed the value of their interest in the ship and freight then pending, for any loss, damage or injury to any property caused by the master, crew or other persons, without their privity or knowledge; and making other provisions for carrying out the design of the act; a final clause is added in the words following, to wit: "This act shall not apply to the owner or owners of any canal-boat, barge or lighter, or to any vessel of any description whatever, used in rivers or inland navigation." The whole act was afterwards carried into the Revised Statutes and constitutes sections 4281 to 4289, inclusive, the section respecting precious metals and jewelry having been somewhat enlarged by an amendment made in 1871. The final words of the act above quoted constitute section 4289 of the Revised Statutes, which, as before stated, was amended by the act of 1886 so as to make the limited liability act apply to all kinds of vessels, not only sea-going vessels, but those used on lakes or rivers, or in inland navigation, including canal-boats, barges and lighters. The 4th section of the act of 1886 also regulates

the application of the 18th section of an act approved June 26, 1884, 23 Stat. 57, which reduced the individual liability of a ship owner for all debts and liabilities of the ship to the proportion of his individual share in the vessel. This section requires no further notice. The only question in the case therefore is, whether the 4th section of the act of 1886, extending the limited liability act to vessels used on a river in inland navigation, like the steamboat in question, is, as contended, unconstitutional and void.

It is unnecessary to inquire whether the section is valid as to all the kinds of vessels named in it; if it is valid as to the kind to which the steamboat Katie belongs it is sufficient for the purposes of this case. And this question we think can be solved by a reference to two or three propositions which have become the settled law of this country.

It is unnecessary to invoke the power given to Congress to regulate commerce with foreign nations, and among the several states, in order to find authority to pass the law in question. The act of Congress which limits the liability of ship owners was passed in amendment of the maritime law of the country, and the power to make such amendments is coextensive with that law. It is not confined to the boundaries or class of subjects which limit and characterize the power to regulate commerce; but, in maritime matters, it extends to all matters and places to which the maritime law extends. The subject has frequently been up for consideration by this court for many years past, and but one view has been expressed. It was gone over so fully, however, in the late case of *Butler* v. *Boston Steamship Co.*, 130 U. S. 527, that we cannot do better than to quote a single passage from the opinion of the court in that case. We there said:

"The law of limited liability, as we have frequently had occasion to assert, was enacted by Congress as a part of the maritime law of this country, and therefore it is coextensive, in its operation, with the whole territorial domain of that law. *Norwich Co.* v. *Wright*, 13 Wall. 104, 127; *The Lottawana*, 21 Wall. 558, 577; *The Scotland*, 105 U. S. 24, 29, 31; *Providence & New York Steamship Co.* v. *Hill Manufacturing Co.*,

109 U. S. 578, 593. In *The Lottawana* we said: 'It cannot be supposed that the framers of the Constitution contemplated that the law should forever remain unalterable. Congress undoubtedly has authority under the commercial power, if no other, to introduce such changes as are likely to be needed.' p. 577. Again, on page 575, speaking of the maritime jurisdiction referred to in the Constitution, and the system of law to be administered thereby, it was said: 'The Constitution must have referred to a system of law coextensive with, and operating uniformly in, the whole country. It certainly could not have been the intention to place the rules and limits of maritime law under the disposal and regulation of the several States, as that would have defeated the uniformity and consistency at which the Constitution aimed on all subjects of a commercial character affecting the intercourse of the States with each other or with foreign states.' In *The Scotland* this language was used: 'But it is enough to say, that the rule of limited responsibility is now our maritime rule. It is the rule by which, through the act of Congress, we have announced that we propose to administer justice in maritime cases.' p. 31. Again, in the same case, p. 29, we said: 'But, whilst the rule adopted by Congress is the same as the rule of the general maritime law, its efficacy as a rule depends upon the statute, and not upon any inherent force of the maritime law. As explained in *The Lottawana.* . . . the maritime law is only so far operative as law in any country as it is adopted by the laws and usages of that country; and this particular rule of the maritime law had never been adopted in this country until it was enacted by statute. Therefore, whilst it is now a part of our maritime law, it is, nevertheless, statute law.' And in *Providence & New York Steamship Co.* v. *Hill Man'f'g Co.* it was said: 'The rule of limited liability prescribed by the act of 1851 is nothing more than the old maritime rule, administered in courts of admiralty in all countries except England, from time immemorial; and if this were not so, the subject matter itself is one that belongs to the department of maritime law.' p. 593.

"These quotations are believed to express the general, if

not unanimous, views of the members of this court for nearly twenty years past; and they leave us in no doubt that, whilst the general maritime law, with slight modifications, is accepted as law in this country, it is subject to such amendments as Congress may see fit to adopt. One of the modifications of the maritime law, as received here, was a rejection of the law of limited liability. We have rectified that. Congress has restored that article to our maritime code. We cannot doubt its power to do this. As the Constitution extends the judicial power of the United States to 'all cases of admiralty and maritime jurisdiction,' and as this jurisdiction is held to be exclusive, the power of legislation on the same subject must necessarily be in the national legislature, and not in the state legislatures. It is true, we have held that the boundaries and limits of the admiralty and maritime jurisdiction are matters of judicial cognizance, and cannot be affected or controlled by legislation, whether state or national. Chief Justice Taney, in *The St. Lawrence*, 1 Black, 522, 526, 527; *The Lottawana*, 21 Wall. 558, 575, 576. But within these boundaries and limits the law itself is that which has always been received as maritime law in this country, with such amendments and modifications as Congress may from time to time have adopted.

"It being clear, then, that the law of limited liability of ship owners is a part of our maritime code, the extent of its territorial operation (as before intimated) cannot be doubtful. It is necessarily co-extensive with that of the general admiralty and maritime jurisdiction, and that by the settled law of this country extends wherever public navigation extends — on the sea and the great inland lakes, and the navigable waters connecting therewith. *Waring* v. *Clarke*, 5 How. 441; *The Genesee Chief* v. *Fitzhugh*, 12 How. 443; *Jackson* v. *The Magnolia*, 20 How. 296; *Commercial Transportation Co.* v. *Fitzhugh*, 1 Black, 574." pp. 555–557.

It being established, therefore, that the law of limited liability is part of the maritime law of the United States, it only remains to determine whether that law may be applied to navigable rivers above tide water, such as the Savannah River, and to vessels engaged in commerce on such a river, like the

steamboat Katie, in this case. Of this there can be no doubt whatever. The question has been settled by a long course of decisions, some of which are here referred to. *Genesee Chief* v. *Fitzhugh*, 12 How. 443; *Fretz* v. *Bull*, 12 How. 466; *Jackson* v. *The Magnolia*, 20 How. 296; *Nelson* v. *Leland*, 22 How. 48; *The Propeller Commerce*, 1 Black, 574; *The Hine* v. *Trevor*, 4 Wall. 555; *The Belfast*, 7 Wall. 624; *The Eagle*, 8 Wall. 15; *The Daniel Ball*, 10 Wall. 557; *The Montello*, 20 Wall. 430; *Ex parte Boyer*, 109 U. S. 629.. In all of these cases it was held that the admiralty and maritime jurisdiction granted to the Federal government by the Constitution of the United States is not limited to tide waters, but extends to all public navigable lakes and rivers. In some of the cases it was held distinctly that this jurisdiction does not depend on the question of foreign or interstate commerce, but also exists where the voyage or contract, if maritime in character, is made and to be performed wholly within a single State. Mr. Justice Clifford, in the opinion of the court in *The Belfast*, said: "Principal subjects of admiralty jurisdiction are maritime contracts and maritime torts, including captures *jure belli*, and seizures on water for municipal and revenue forfeitures. (1) Contracts, claims or service, purely maritime, and touching rights and duties appertaining to commerce and navigation, are cognizable in the admiralty. (2) Torts or injuries committed on navigable waters, of a civil nature, are also cognizable in the Admiralty Courts. Jurisdiction in the former case depends upon the nature of the contract, but in the latter depends entirely upon locality. . . . . Navigable rivers, which empty into the sea, or into the bays and gulfs which form a part of the sea, are but arms of the sea, and are as much within the admiralty and maritime jurisdiction of the United States, as the sea itself. Difficulties attend every attempt to define the exact limits of admiralty jurisdiction, but it cannot be made to depend upon the power of Congress to regulate commerce, as conferred in the Constitution. They are entirely distinct things, having no necessary connection with one another, and are conferred, in the Constitution, by separate and distinct grants." pp. 637, 640.

*Jackson* v. *The Magnolia* was a case of collision between two steamboats on the Alabama River, far above tide water, and within the jurisdiction of a county. A libel in admiralty was filed by one of the parties in the District Court of the United States, which was dismissed on the ground of want of jurisdiction. This court reversed the decree and maintained the admiralty jurisdiction. Mr. Justice Grier, delivering the opinion of the court, said: "Before the adoption of the present constitution, each State, in the exercise of its sovereign power, had its own Court of Admiralty, having jurisdiction over the harbors, creeks, inlets and public navigable waters, connected with the sea. This jurisdiction was exercised not only over rivers, creeks and inlets, which were boundaries to or passed through other States, but also where they were wholly within the State. Such a distinction was unknown, nor (as it appears from the decision of this court in the case of *Waring* v. *Clarke*, 5 How. 441) had these courts been driven from the exercise of jurisdiction over torts committed on navigable water within the body of a county, by the jealousy of the common law courts. When, therefore, the exercise of admiralty and maritime jurisdiction over its public rivers, ports and havens was surrendered by each State to the government of the United States, without an exception as to subjects or places, this court cannot interpolate one into the constitution, or introduce an arbitrary distinction which has no foundation in reason or precedent." p. 298.

In *Nelson* v. *Leland*, the same conclusion was reached, and the same doctrine maintained. That was also a case of collision between a steamer and a flat-boat on the Yazoo River, which lies wholly in the State of Mississippi, and empties into the Mississippi River.

In the case of *The Propeller Commerce* it was held that in order to bring a case of collision within the admiralty jurisdiction of the Federal courts it is not necessary to show that either of the vessels was engaged in foreign commerce, or commerce between the States. Maritime torts, such as collision, etc., committed on navigable waters above tide water, are cognizable in the admiralty, without reference to the voyage or destination of either vessel.

In the case of *The Belfast*, it was decided that on an ordinary contract of affreightment the shipper has a maritime lien which may be enforced in the admiralty courts, although the contract be for transportation between ports and places within the same State, provided it be upon navigable waters, to which the general jurisdiction of the admiralty extends.

In the case of *The Montello*, it was held that Fox River, in Wisconsin, is a navigable river, although made such by artificial improvements, and that a steamer navigating the same is subject to the laws of the United States with regard to the enrolment and license of vessels, and is liable to be proceeded against in admiralty for non-compliance with such laws.

In *Ex parte Boyer*, it was decided that the admiralty jurisdiction extends to a steam canal-boat, in case of collision between her and another canal-boat, whilst the two boats were navigating the Illinois and Lake Michigan Canal, although the libellant's boat was bound from one place in Illinois to another place in the same State. Mr. Justice Blatchford, delivering the opinion of the court in that case, said: "Within the principles laid down by this court in the cases of *The Daniel Ball*, 10 Wall. 557, and *The Montello*, 20 Wall. 430, which extended the salutary views of admiralty jurisdiction applied in *The Genesee Chief*, 12 How. 443, *The Hine* v. *Trevor*, 4 Wall. 555, and *The Eagle*, 8 Wall. 15, we have no doubt of the jurisdiction of the District Court in this case. Navigable water situated as this canal is, used for the purposes for which it is used, a highway for commerce between ports and places in different States, carried on by vessels such as those in question here, is public water of the United States, and within the legitimate scope of the admiralty jurisdiction conferred by the Constitution and statutes of the United States, even though the canal is wholly artificial, and is wholly within the body of a State, and subject to its ownership and control; and it makes no difference as to the jurisdiction of the District Court that one or the other of the vessels was at the time of the collision on a voyage from one place in the State of Illinois to another place in that State. *The Belfast*, 7 Wall. 624." pp. 631, 632.

In view of the principles laid down in the cases now referred to, we have. no hesitation in saying that the Savannah River, from its mouth to the highest point to which it is navigable, is subject to the maritime. law and the admiralty jurisdiction of the United States.  It follows, as a matter of course, that Congress, having already, by the act of 1851, amended the maritime law by giving the benefit of a limited liability to the owners of all vessels navigating the oceans and great lakes of the country, and withholding it from the owners of vessels used in rivers or inland navigation, was perfectly competent to abolish that restriction in 1886, and extend the same benefi- cent rule to the latter class also.  We think that the act in question, namely, the 4th section of the act of 1886, is a con- stitutional and valid law.

As regards the steamboat itself, and the business in which she was engaged, in view of the authorities already referred to, there is not the slightest doubt that the case was one within the admiralty jurisdiction.  The steamboat was a regu- larly enrolled and licensed vessel of the United States, and was engaged in maritime commerce on the Savannah River, one of the navigable rivers of the United States.

*The writ of prohibition is denied.*