# OBRECHT–LYNCH CORPORATION et al. v. CLARK.

District Court, D. Maryland.   January 2, 1929.

## No. 1377.

Joseph T. England and Julius F. Sandrock, both of Baltimore, Md., for plaintiffs.

J. Purdon Wright, of Baltimore, Md., for claimant.

O. N. Forrest, Asst. U. S. Atty., of Baltimore, Md., for commissioner.

WILLIAM C. COLEMAN, District Judge. This is a proceeding for review of a compensation order under the Longshoremen's and Harbor Workers' Compensation Act. Act March 4, 1927, chapter 509 (33 USCA § 901). Complainant, the Obrecht-Lynch Corporation, employed one Alonzo V. Kimbel as a repairman on the steamship City of Flint. While so engaged on December 22, 1927, he was injured by a heavy tank covering falling against his left leg, causing contusions above and below the knee. As a result, he required medical treatment and was confined to his bed for about one week. On January 6th, 14 days after the injury, while he was no longer confined to his bed, but had not yet returned to work, he became suddenly ill, complained of great difficulty in breathing, and died in 10 or 15 minutes, before medical aid could be summoned. The widow of Kimbel filed, in due course, a claim in the office of the deputy commissioner, Lindley D. Clark, for district No. 4 in Baltimore, for compensation pursuant to the provisions of the act. A hearing was had, much testimony was taken, and as a result the deputy commissioner found that Kimbel had died from a pulmonary embolism resulting from the injury to his leg, and awarded to the widow, in addition to compensation for temporary total disability and funeral expenses, the sum of $7,500, payable in semimonthly installments of $23.36.

The complainant, Obrecht-Lynch Corporation, and its insurer, Phœnix Indemnity Company, contest the claim on the ground that there was no causal connection between the injuries which the deceased employee suffered and his death, and have brought these injunction proceedings, praying that the Act be declared unconstitutional and invalid, that the award be set aside, and that, pending final decision of this court with respect thereto, a temporary stay of all payments under the award be allowed.

Section 921 (b) of the act provides as follows:

"If not in accordance with law, a compensation order may be suspended or set aside, in whole or in part, through injunction proceedings, mandatory or otherwise, brought by any party in interest against the deputy commissioner making the order, and instituted in the Federal district court for the judicial district in which the injury occurred (or in the Supreme Court of the District of Columbia if the injury occurred in the District). The orders, writs, and processes of the court in such proceedings may run, be served, and be returnable anywhere in the United States. The payment of the amounts required by an award shall not be stayed pending final decision in any such proceeding unless upon application for an interlocutory injunction the court, on hearing, after not less than three days' notice to the parties in interest and the deputy commissioner, allows the stay of such payments, in whole or in part, where irreparable damage would otherwise ensue to the employer. The order of the court allowing any such stay shall contain a specific finding, based upon evidence submitted to the court and identified by reference thereto, that such irreparable damage would result to the employer, and specifying the nature of the damage."

It will be seen that a temporary stay of payments awarded can be ordered only where the court finds, after a consideration of the evidence, that irreparable damage would in fact result to the employer if such stay were not granted. At the hearing, the evidence submitted failed to satisfy the court in this respect and, therefore, an interlocutory injunction was denied. Claimant was shown to be financially responsible to the extent of the payments involved. Whether insolvency would of itself be sufficient cause for granting a stay, it becomes unnecessary to decide. See Willis v. O'Connell (D. C.) 231 F. 1004.

The act in question, having been in force less than two years, has, as yet, not been subject to extensive judicial review, and the reported cases construing the act are few in number. For this reason, and also because of the fact that the language of section 921b is not entirely free from ambiguity, complainants have contended that, when an employer invokes the remedy thereby provided, such employer is entitled to have

the proceedings reopened and the matter tried de novo. It is to be noted that section 921 (b) provides: *"If not in accordance with law,* a compensation order may be suspended or set aside, in whole or in part, through injunction proceedings, mandatory or otherwise, brought by any party in interest against the deputy commissioner making the order," etc. (Italics inserted.) What do the words "if not in accordance with law" mean? The court has been referred to no Workmen's Compensation Act, state or federal, which uses this precise language. However, it is well settled that compensation laws of this general character, which establish administrative machinery for applying statutory measures to the facts of each particular case, and which provide for a hearing before an administrative tribunal, may limit the judicial review to fundamental and jurisdictional questions. In short, administrative bodies, with authority not essentially different from that vested by the act now under consideration in the deputy commissioner, are recognized governmental institutions. State industrial accident commissions and state public service commissions are familiar examples. Powers and discretions of this character may be delegated to administrative bodies, or even to a single individual. Plymouth Coal Co. v. Pennsylvania, 232 U. S. 531, 34 S. Ct. 359, 58 L. Ed. 713; Hawkins v. Bleakly, 243 U. S. 210, 37 S. Ct. 255, 67 L. Ed. 678, Ann. Cas. 1917D, 637, and cases cited. The proper construction of the language in question seems to the court to be that, as long as there is some competent evidence to support the finding of fact of the commissioner, such finding is final; that is, where the finding is supported by rational and natural inferences from proved facts, the court will not disturb such finding.

This being true, it follows that hearings provided by section 921 (b) should be confined to a review of the testimony presented to the deputy commissioner. In the instant case, however, because of the very recent enactment of this statute and the consequent lack of authorities construing its language, the court gave the complainants the benefit of the doubt which it had at the inception of the hearing respecting the proper construction to be placed upon section 921 (b), and heard the matter de novo. This departure from what the court now believes to be the proper procedure, after an opportunity for more careful examination of the statute and pertinent authorities, has, in fact, proved to be immaterial, because, as hereinafter explained, the court finds that its conclusion is not affected by the additional evidence heard, but may be rested solely upon the testimony taken before the deputy commissioner.

The constitutionality of the act having been questioned, it is necessary first to answer that argument. The act not being elective, but mandatory upon complainants, they cannot be said to have waived their right to question the constitutionality of the act by accepting its insurance provisions, etc. See Hawkins v. Bleakly, 243 U. S. 210, 37 S. Ct. 255, 67 L. Ed. 678, Ann. Cas. 1917D, 637; Booth Fisheries v. Industrial Commission, 271 U. S. 208, 46 S. Ct. 491, 70 L. Ed. 908. Complainants assert three grounds on which the act is claimed to be unconstitutional: First, that it violates the Seventh Amendment to the Constitution, by failure to provide for trial by jury; second, that it seeks to limit the admiralty jurisdiction of the federal courts; and, third, that no adequate provision for appeal is made, and that, therefore, due process of law is denied them, pursuant to the Fifth Amendment.

The present act is modeled upon the New York Workmen's Compensation Law (Laws 1913, c. 816; Laws 1914, cc. 41, 316; Consol. Laws, c. 67). In fact, its provisions are largely identical, substituting for the employer and employee in certain employments classed as hazardous the employer and employee engaged in maritime pursuits in whole or in part upon navigable waters of the United States. In short, it provides for a compulsory system governing liabilities of employers and the rights of employees and their dependents in respect to compensation for disabling injuries and death, in cases where recovery through workmen's compensation proceedings may not validly be provided by state law. Colonna's Shipyard v. Lowe (D. C.) 22 F.(2d) 843. The so-called Merchant Marine Act of June 5, 1920 (46 USCA § 688), is not repealed by this more recent enactment. The former still embraces employees that the latter does not, as witness the language of section 902 (3) of the latter, which excludes "a master or member of a crew of any vessel," and "any person engaged by the master to load or unload or repair any small vessel under eighteen tons net." Parenthetically, it may be added that, although the Supreme Court in International Stevedoring Co. v. Haverty, 272 U. S. 50, 47 S. Ct. 19, 71 L. Ed. 157, has declared that the word "seamen," as used in the Merchant Marine Act, includes longshoremen employed by stevedores while on a vessel, under the Longshoremen's Act, Congress has apparently expressed an intention to remove such per-

sons from the operation of the earlier act, as thus construed by the Supreme Court, and to place them under the later act.

In New York Central Railroad Co. v. White, 243 U. S. 188, 37 S. Ct. 247, 61 L. Ed. 667, L. R. A. 1917D, 1, Ann. Cas. 1917D, 629, the Supreme Court upheld the constitutionality of the New York law. The arguments that the act violated the due process and equal protection clauses of the Fourteenth Amendment to the Constitution were considered in an elaborate opinion by Mr. Justice Pitney and held to be untenable. This case was decided in 1917. Seven years later the Supreme Court, in State of Washington v. Dawson & Co., 264 U. S. 219, 44 S. Ct. 302, 68 L. Ed. 646, declared unconstitutional the Act of Congress of June 10, 1922 (chapter 216, 42 Stat. 634), which by amendment to Judicial Code, §§ 24, 256 (28 USCA §§ 41, 371), undertook to permit application of the workmen's compensation laws of the several states to injuries within the admiralty and maritime jurisdiction. This was done on the authority of Southern Pacific Co. v. Jensen, 244 U. S. 205, 37 S. Ct. 524, 61 L. Ed. 1086, L. R. A. 1918C, 451, Ann. Cas. 1917E, 900, and Knickerbocker Ice Co. v. Stewart, 253 U. S. 149, 40 S. Ct. 438, 64 L. Ed. 834, 11 A. L. R. 1145, on the ground that such legislation defeated the purpose of the Constitution respecting the harmony and uniformity of the maritime law. In the Dawson Case, the court, speaking through Mr. Justice McReynolds, said (264 U. S. at page 227, 44 S. Ct. 305): "Without doubt Congress has power to alter, amend or revise the maritime law by statutes of general application embodying its will and judgment. This power, we think, would permit enactment of a general employers' liability law or general provisions for compensating injured employees; but it may not be delegated to the several states."

In spite of this dictum and the passage of the law now under consideration, and in spite of the further fact that it was modeled on the New York law which, as just explained, has been upheld by the Supreme Court in the White Case, complainants here contend that the present act raises serious constitutional objections as above set forth, which are not foreclosed by those decisions. With this we cannot agree. It is true that in the White Case the court was dealing with a state statute, and that in sustaining its constitutionality was concerned with the due process and equal protection clauses of the Fourteenth Amendment, and not with the precise questions now raised.

But as to the first question, namely, failure to provide in the act for trial by jury, while the New York law does so provide, it is sufficient to quote from the decision of the Supreme Court in Parsons v. Bedford, 3 Pet. 433, at pages 445, 446 (7 L. Ed. 732), in which, as early as 1830, Justice Story said:

"The phrase 'common law,' found in this clause [the Seventh Amendment], is used in contradistinction to equity, and admiralty and maritime jurisprudence. The Constitution had declared, in the third article, 'that the judicial power shall extend to all cases in law and equity arising under this Constitution, the laws of the United States, and treaties made or which shall be made under their authority,' etc., and to all cases of admiralty and maritime jurisdiction. It is well known, that in civil causes in courts of equity and admiralty, juries do not intervene, and that courts of equity use the trial by jury only in extraordinary cases, to inform the conscience of the court. When, therefore, we find, that the amendment requires that the right of trial by jury shall be preserved, in suits at common law, the natural conclusion is, that this distinction was present to the minds of the framers of the amendment. By common law, they meant what the Constitution denominated in the third article 'law,' not merely suits, which the common law recognized among its old and settled proceedings, but suits in which legal rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered; or where, as in the admiralty, a mixture of public law, and of maritime law and equity, was often found in the same suit. * * *

"In a just sense, the amendment then may well be construed to embrace all suits, which are not of equity and admiralty jurisdiction, whatever may be the peculiar form which they may assume to settle legal rights. And congress seems to have acted with reference to this exposition, in the Judiciary Act of 1789, c. 20 (which was contemporaneous with the proposal of this amendment); for in the ninth section it is provided that 'the trial of issues in fact in the District Courts, in all causes, except civil causes of admiralty and maritime jurisdiction, shall be by jury;' and in the twelfth section it is provided that 'the trial of issues in fact in the circuit courts shall, in all suits, except those of equity and of admiralty and maritime jurisdiction, be by jury;' and again, in the thirteenth section, it is provided that the trial of issues in fact,

in the Supreme Court, in all actions at law, against citizens of the United States, shall be by jury."

Again, in the case of Waring v. Clarke, 5 How. 441, at pages 459, 460 (12 L. Ed. 226), in 1847, the Court reiterated its construction of the Seventh Amendment, as follows:

"Suits at common law are a distinct class, so recognized in the constitution, whether they be such as are concurrent with suits of which there is jurisdiction in admiralty, or not. * * * There is no escape from this result, unless it is to be implied that the amendments were proposed by persons careless or ignorant of the difference in the mode of trial of suits at common law and in admiralty. But they were not so, for we find some of them in Congress, a few months after, preparing and concurring in the enactment of a law, that the 'trials of issues in fact in the District Courts, in all causes except civil causes of admiralty and maritime jurisdiction, shall be by jury.' "

And in 1899, in Capital Traction Co. v. Hof, 174 U. S. 1, at page 13, 19 S. Ct. 580, 585 (43 L. Ed. 873), Justice Gray spoke with the same conclusiveness, as follows:

"It must therefore be taken as established, by virtue of the Seventh Amendment of the Constitution, that either party to an action at law (as distinguished from suits in equity or in admiralty) in a court of the United States, where the value in controversy exceeds twenty dollars, has the right to a trial by jury."

Turning to the second question, namely, that the act limits the admiralty jurisdiction of the federal courts, the gist of this argument appears to be that since the judicial power of the United States by article 3, § 2, of the Constitution is extended to all cases of admiralty and maritime jurisdiction, the vesting in an administrative officer, such as the deputy commissioner under the present act, of the power to hear and determine the rights of the parties in such cases as the present one, is an unwarranted delegation by Congress of this judicial power which, by article 3, § 1, of the Constitution, is vested "in one Supreme Court, and in such inferior courts as the Congress may from time to time ordain and establish." This argument seems to be conclusively overcome by the language in the Dawson Case above quoted, and also by the language in the Jensen Case, supra, in which the court said, on pages 214, 215, of 244 U. S. (44 S. Ct. 528):

"Article 3, § 2, of the Constitution, extends the judicial power of the United States 'to all cases of admiralty and maritime jurisdiction'; and article 1, § 8, confers upon the Congress power 'to make all laws which may be necessary and proper for carrying into execution the foregoing powers and all other powers vested by this Constitution in the government of the United States or in any department or officer thereof.' Considering our former opinions, it must now be accepted as settled doctrine that in consequence of these provisions Congress has paramount power to fix and determine the maritime law which shall prevail throughout the country. Butler v. Boston & Savannah Steamship Co., 130 U. S. 527 [9 S. Ct. 612, 32 L. Ed. 1017]; In re Garnett, 141 U. S. 1, 14 [11 S. Ct. 840, 35 L. Ed. 631]."

There remains to be considered the third and last constitutional objection to the act, namely, that there is provided no adequate right of appeal, and that therefore complainants are denied due process of law. What has already been said with respect to this point would seem to refute any argument that the right of appeal must be more extensive than that which is actually granted. In Plymouth Coal Co. v. Pennsylvania, supra, it was said, on page 547 of 232 U. S. (34 S. Ct. 364):

"It is further objected that the statute provides for no appeal from the determination of the tribunal. But in such cases the right of appeal on other than constitutional grounds may be conferred or withheld, at the discretion of the Legislature. As already pointed out, an appeal on fundamental grounds in this instance seems to inhere in the very practice prescribed by the statute for the enforcement of the determination of the statutory tribunal. Were this not expressed in the act, it would none the less be implied, at least so far as pertains to any violation of rights guaranteed by the Fourteenth Amendment. Yick Wo v. Hopkins, 118 U. S. 356, 370 [6 S. Ct. 1064, 30 L. Ed. 220]; Lieberman v. Van De Carr, 199 U. S. 552, 562 [26 S. Ct. 144, 50 L. Ed. 305]."

Surely, in this matter, complainants cannot be allowed any greater rights under the Fifth Amendment than would arise under the Fourteenth Amendment, were we concerned with a state and not a federal statute. In U. S. v. Heinze, 218 U. S. 532, 31 S. Ct. 98, 54 L. Ed. 1139, 21 Ann. Cas. 884, it was argued that due process of law and equal protection of the law was denied to an accused under the Act of March 2, 1907, c. 2564 (18 USCA § 682), which gave the Government an appeal to the Supreme Court under certain conditions from judgments sustaining demurrers to, or motions to quash indictments,

because the same appeal was not allowed to the accused in case the demurrer or motion to quash were overruled. In reply to this argument the court said, at page 546 (31 S. Ct. 102):

"If we should yield to the argument it would necessarily follow that if defendant has not been denied due process he has not been denied the equal protection of the law, and this court has decided that the right of appeal is not essential to due process of law. Reetz v. Michigan, 188 U. S. 505, 508 [23 S. Ct. 390, 47 L. Ed. 563]. The provisions have definite application, and even if the explicit clause of the Fourteenth Amendment, forbidding a state to deny to any person within its jurisdiction the equal protection of its laws, can be said to apply to the United States, it can have no broader meaning when so applied than when applied to the states. Assuming, therefore, and assuming only, not deciding (see District of Columbia v. Brooke, 214 U. S. 138, 149 [29 S. Ct. 560, 53 L. Ed. 941]) that Congress may not discriminate in its legislation, it certainly has the power of classification, and the act of March 2 is well within such power."

Similarly, in the recent case of Luckenbach Steamship Co. v. United States, 272 U. S. 533, 47 S. Ct. 186, 71 L. Ed. 394, it was held that the limits placed by Congress on the scope of review by the Supreme Court of judgments of the Court of Claims do not deprive defeated claimants of due process of law under the Fifth Amendment, the court saying, at page 536 (47 S. Ct. 187), that "the well-settled rule applies that an appellate review is not essential to due process of law but is a matter of grace."

Turning now to the facts in the case we find that only one physician, Dr. Reifschneider, was present at the time Kimbel died. He was not Kimbel's regular physician, but was the first one available in the emergency. He testified at the hearing before the deputy commissioner that upon reaching the deceased's bedside he found him in extremis, breathing with great difficulty, with his hand upon his chest, and that he died within 15 or 20 minutes. Dr. Reifschneider further testified that, according to the previous history of deceased obtained from Mrs. Kimbel, deceased had never had any heart trouble, and being advised of the injury which he had suffered, and upon personal examination after his death, Dr. Reifschneider reported to the commission that in his opinion the deceased died of a pulmonary embolus; that is, an obstruction to the blood circulation through the vessels in the lungs, the pulmonary arteries, resulting from a thrombosis or clot in a blood vessel in his leg, caused by the injury to that member. Dr. O'Connor, testifying before the deputy commissioner, stated that he saw the deceased the afternoon before he died, but that he then appeared to be in good health and to have recovered from his injury, and that he could not give any diagnosis as to the exact cause of death, because he was not present at the time. The third physician, Dr. McCleary, who also testified before the deputy commissioner, had not at any time attended the deceased, but stated that, from the history of the case as submitted to him, it was his opinion that death was caused by a pulmonary embolus.

All three of these physicians testified before the court to the same effect as they had testified before the deputy commissioner. In addition, Dr. O'Connor stated that he thought an autopsy was the only way in which to determine definitely the exact cause of death. The court heard, in addition to these physicians, Dr. Blades, the city coroner, who stated that Dr. Reifschneider had notified him that the deceased had died from heart trouble, and, on the basis of this, that he had made a report that death was due to mitral stenosis, or valvular heart disease, and he further testified that an autopsy was necessary in order to show the exact cause of death. Dr. Love, an additional physician called on behalf of the company, also stated that in his opinion the cause of death could have been, but was not likely to have been, pulmonary embolism, and that an autopsy was the only sure way to determine the question. The same opinion regarding the necessity for an autopsy was expressed by Dr. Wilkerson on behalf of the company. On the other hand, Dr. McGlannan, surgeon in chief to the Mercy Hospital, Baltimore, testifying for claimant, stated that an embolism was very likely to occur from such an accident after such lapse of time, and that he had experienced a similar case in his practice. Dr. Mohr, the family physician, was also permitted to testify, and stated that the deceased had never been, within his knowledge, subject to heart trouble, but only to minor ailments.

Summarizing the above testimony, we find the following: Of the three physicians whose testimony the deputy commissioner heard, one only was actually present at the time Kimbel died, and he certified that his death was due to pulmonary embolism. Of the two remaining physicians, one, testifying for claimant, agreed with Dr. Reifschneider's

diagnosis, and the other, testifying for complainants, was unwilling to make any diagnosis. On this evidence, was the deputy commissioner warranted in finding that the cause of death was pulmonary embolus? The court believes that he was. Undoubtedly, the weight of competent evidence supported such finding. All three are physicians of good standing and wide experience. It is true that the single physician who was present at the time Kimbel died had not been familiar with his previous history, and saw him for only a brief length of time before he expired. It is also true, however, that the physician who had treated Kimbel for his injury saw fit not to attempt to negative this diagnosis, and the third and remaining physician, whose testimony the deputy commissioner heard, supported it. The testimony of these gentlemen before the court remained unshaken, and the testimony of the additional physicians does not add any very convincing medical opinion, respecting the exact cause of death, to the testimony that was heard both by the deputy commissioner and by the court. It is true that Dr. Reifschneider never expressly denied the statement of Dr. Blades, the coroner, that he, Dr. Reifschneider, had reported that the deceased had died of heart trouble; but the testimony of Dr. Reifschneider, both before the deputy commissioner and before the court, plus the uncontradicted history of the patient, seems to outweigh this contradiction. It is not unreasonable for a doctor to revise his first opinion, given under such circumstances.

Complainants appear to have seized upon the fact that Dr. Reifschneider, in the emergency, sent for amyl-nitrite, which it is admitted is prescribed in heart cases, but never prescribed in cases of pulmonary embolus. But it was, in fact, never administered by Dr. Reifschneider. Also, since four doctors, only one of whom, however, had ever attended the patient, and that one was not with him when he died, testified that an autopsy was the only certain way to determine death, complainants attempt to deduce therefrom that the finding of the deputy commissioner was without foundation in fact, and therefore should be reversed. But at the hearing before the deputy commissioner none of the doctors advised an autopsy, nor did complainants at that time renew the request which they had made for an autopsy. Therefore none of these arguments seem to the court sufficient to show that there was not adequate, competent evidence to justify the deputy commissioner in making the finding that he did, and it becomes unnecessary for the court to determine what might be the power or duty of a deputy commissioner under the act, or of the court itself, with respect to an autopsy, whether requested, as here, or not, in a case where lack of evidence might clearly render the same a prerequisite to a determination of the cause of death. In short, although, as previously explained, the court saw fit to hear the case de novo, and thereby to extend to complainants rights in excess of those actually accorded to them under the provisions of the act, the court finds nothing in the additional and cumulative testimony which would lead it to arrive at a different conclusion from that which the deputy commissioner has reached, or which the court itself would have been constrained to reach, had the hearing which it granted been limited in its scope to the same testimony presented before the deputy commissioner.

In other words, the court finding that the act is constitutional and that the compensation order thereunder was wholly "in accordance with law," the complaint must, therefore, be dismissed. It will be so ordered.