## SULOVITZ v. UNITED STATES et al.

### No. 83 of 1944.

District Court, E. D. Pennsylvania.

Nov. 16, 1945.

Louis Marcus and Philip Dorfman, both of Philadelphia, Pa., for Israel Sulovitz.

Krusen, Evans & Shaw, of Philadelphia, Pa., for United States and War Shipping Administration.

Thomas E. Byrne, Jr., of Philadelphia, Pa., for United States and War Shipping Administration.

Howard R. Detweiler, of Philadelphia, Pa., for Atlantic & Gulf Stevedores, Inc.

WELSH, District Judge.

This suit was brought to recover damages for injuries sustained by the libellant while working aboard the Liberty Ship, William Aspinwall.

### Findings of Fact

1. The Libellant was employed as a carpenter by the Philadelphia Ship Supply & Lumber Company and on April 14, 1944, was erecting an ammunition magazine on the tweendecks of the Aspinwall near the Number 5 hatch. At the same time cargo was being loaded through the hatch by the Atlantic and Gulf Stevedores, Inc., under contract with the United States as the owner of the vessel.

2. The stevedores were lowering a cased gun through the hatch when a link in the loading gear parted, causing the case to strike a partition and scaffolding then being erected by the carpenters and causing timbers to fall upon the Libellant and injure him.

3. The loading gear at Number 5 hatch consisted of two booms, two winches, and the necessary cables, gin blocks and loading hooks, which gear had a safe capacity of 5 tons. The gear had been inspected by visual examination on April 10 and 11, at

which time no defect was discovered. Its capacity was known to the ship officers and the superintendent of the stevedores engaged in the loading.

4. It is customary during loading operations for a mate of the vessel to be on duty to look after the interests of the ship and see that it and its cargo gear are not damaged by undue overloading or other abuse. Specific instructions to that effect had been given by the Captain to the Second Mate who was then in charge of the deck. Such duty is usually performed by making frequent journeys about the ship for the purpose of observation.

5. The case which fell while being loaded was 173" x 74" x 72" and weighed 12,-150 pounds the weight being marked upon the case. It was being loaded by means of two double fall lines, one running from the starboard winch over the boom heads and down to the load and the other from the port winch to the wharf shed and thence down to the load, with gin blocks at the bottom of each fall. The gin blocks were shackled together, and there was attached to them by means of shackles the swivel chain and cargo hook. The swivel consisted of two elliptical chain links with one end of each flattened perpendicular to its length and with holes extending through the link metal. They are attached together by means of a pin extending thru the holes and riveted. One of the links was fastened to the eye of the cargo hook. The chain pendant cargo hook offered as an exhibit was not the hook being used at the time of the accident.

6. Although the testimony was conflicting as to the arrangement of the gear used, we find, from the evidence and the diagrams submitted and explained, that the cased gun was lifted and lowered by means of two wire cables looped around the case at each end. One loop was fastened by a shackle to one of the gin blocks and the other to the hook and swivel links which were fastened to the shackles connecting the two gin blocks. By such means the weight of the lift was distributed between the gin block to which one loop was fastened, and the hook and swivel to which the other loop was fastened, so that only a portion of the whole weight was suspended on the swivel links and cargo hook at the time the link parted.

7. When the cased gun was suspended by such means and was being lowered through the hatch, the upper link of the chain swivel parted, permitting the load to fall. The link which broke was defective in that the weld or joint of the link was not complete. Only a fraction of the diameter of the link metal had been successfully joined and the unjoined surface areas were found to be rusty.

8. As a result of the accident the Libellant suffered a partial fracture of the ilium extending to the sacroiliac joint and comminuted fracture of the great trochanter of the left leg. These injuries have been cured except for minor displacement of segments which causes slight limitation of motion and pain upon bending, kneeling and in certain positions while reclining. The Libellant is 63 years of age and his expectancy is 12.26 years. As a result of the injuries he was confined to the hospital for 17 days and to his bed for 4 weeks thereafter. He was unable to work until the latter part of November, 1944, when he worked 2½ weeks. Thereafter he worked during two short periods of 3 or 4 days each, between that time and the date of the trial. His earnings during said period were $537.30.

9. The Libellant suffered severe pain as a result of the injuries and at present suffers pain upon kneeling, bending and at times while lying in certain positions in bed. He is at present able to work only 3 or 4 days a week, and he is unable to do the heavy work incident to his trade.

10. The established rate of pay for carpenters is $1.58 per hour for a 40-hour week, with time and one-half for overtime. Prior to the accident he had been working 48 hours per week.

11. The Libellant's hospital bill was $116. He has received additional medical treatment through the clinical services of the Respondent's insurance carrier.

■ The defect in the swivel link rendered the vessel unseaworthy with respect to the cargo-loading gear, and the accident was directly attributable to that defect. Such unseaworthiness rendered the vessel and its owner liable for the injury sustained. In reaching this conclusion, we follow Sieracki v. Seas Shipping Co., Inc., et al., 3 Cir., 149 F.2d 98, 101. In that case, as here, the issue was whether a longshoreman, who had been injured by a like unseaworthiness of cargo gear, was entitled to the same protection as a seaman. The Circuit Court there held that the legal liability of a vessel owner toward longshore-

men rendering service upon a ship necessary in the performance of its business, was in the nature of an insurer's liability, rooted in the Admiralty Law.

■ A longshoreman is generally deemed to be a laborer employed about the wharves of a port, especially in loading and unloading vessels. The term is not limited to stevedores, however, but may be applied to other laborers or mechanics who fit, refit and repair ships and thereby contribute services to or in connection with the loading operations. The Libellant, although described as a carpenter and employed by ship suppliers, was actually working in the ship, preparing it to receive a cargo requiring special provision for its storage, and was therefore rendering services necessary in the performance of the ship's business of carrying cargo. The principle applied to longshoremen in the Sieracki case should, for like reasons, be applicable to the present Libellant. As pointed out by the Court, "when a man is performing a function essential to maritime service on board a ship the fortuitous circumstances of his employment by the ship owner or a stevedoring contractor should not determine the measure of his rights"; although he may be denied a seaman's right to recover for maintenance and cure.

■ We think that the weight of argument favors the extension of the obligation of protection, as measured by the Admiralty Law, to a ship supplier's employee during the period he is actually engaged upon the ship in the loading or the preparation for the loading thereof. While so engaged, he is in maritime employment and subject to its risks; and if he is injured in the course of that work, he may have redress for the injuries resulting from unseaworthiness.

■ The evidence does not support the contention that the Master was negligent in making an inspection which was insufficient to disclose the defect in the link. Reasonable care does not require him to make more than a visual examination, whereas the defect in the link was such that it might not be discovered except upon a close, nor possibly a microscopic, examination. Nor was the failure of the Second Mate to observe and prevent the use to which the gear was put negligence for which the owner is responsible. Both custom and the Master's instructions required him to protect the ship and its gear from abuse by anyone on the vessel, and to prevent the operation of the loading gear in a manner which might cause damage or injury.

We must recognize, however, the practical and customary manner of performing such duty and appreciate that supervision by a single officer could be no more than a general overall observation of the activities on board, and the prevention of abuses or damages which might come to his attention. As stated by the Master the duty of the Mate was to look after the interests of the ship, to see that the gear was not "unduly" loaded—"to see that they don't try to pick up fifty tons with a five-ton boom"—but that he could not be in all parts of the ship at once. The performance of this general duty did not require the Mate to inspect and determine the weight of each unit of cargo or to conclude that a lift of 6 tons would constitute an undue hazard to the gear certified as having a five-ton capacity. Even if he had been aware of the weight of the lift in question he could properly assume that a safety factor had been allowed in the certification of capacity and that the stevedores, as experts could so rig the gear as to successfully perform the operation. We therefore find no negligence on the part of the ship's officers which would impose liability upon the owners.

■ Much of the testimony involved the manner in which the loading gear was rigged and whether or not the lift in fact exceeded the capacity. If the Master's testimony be accepted as entirely accurate it must be found that the whole weight was suspended on the hook and chain swivel, and that it exceeded the capacity by 950 pounds, if the measure were in long tons, as testified by the stevedore, or by 2150 pounds if the short ton were the measure. On the other hand, the testimony of the stevedore superintendent who actually directed the rigging of the gear, and whom we may consider as an expert in such matters, stated that by using two booms and suspending the lift from two points the safe capacity of the gear used was in fact seven tons, and that only a portion of the weight was placed upon the swivel link.

We are inclined to accept the explanation of the superintendent as the more correct and to assume that his experience qualified him to better judge the proper rigging and the procedure to be used in the loading. The operation involved shipment of war material urgently needed and we assume

that the superintendent was aware of the exigency and his share of the responsibility in stowing the cargo. We believe he exercised his best judgment based upon long experience and knowledge of rigging and loading procedures. If his judgment of the capacity of the rigging, based upon the explanation which he has given, were in fact faulty, it does not follow that the error constituted negligence for which his employer became liable. The fact remains that the defective link was the direct cause of the fall, and that there was no negligence on the part of either the crew or the stevedores.

The damages to be awarded to the Libellant must be in such amount as may reasonably be expected to compensate him for present losses, for pain and suffering, and for probable future suffering and loss of earnings. The mathematical calculations urged by the Libellant, based upon present rates of pay and hours, and the Libellant's expectancy, do not fully take into account all of the probabilities with respect to the Libellant's future. He is presently somewhat limited in performing the work of his trade and quite probably will be unable to do the heavier carpentry work over the prolonged hours of labor now prevailing; this may be due both to his injury and to his advancing years. It may be reasonably anticipated, however, that he will obtain acceptable employment in the lighter work of his trade or in another vocation or industry to which he can devote his full time, and that his financial loss will not be as great as he now anticipates. Taking into consideration all of the elements entering into a determination of damages, we believe that $7,000 represents a fair and reasonable compensation for the Libellant's pain and suffering, his loss of earnings up to this time, and his probable future suffering and financial loss.

## Conclusions of Law

1. The Libellant is a workman engaged in a maritime occupation, to whom the owners of the vessel became liable for injuries resulting from the unseaworthiness of the loading gear.

2. The S.S. William Aspinwall was, on April 14, 1944, unseaworthy with respect to the swivel link on the cargo pendant hook, which was a component part of the loading gear of Number 5 hatch.

3. The Second Mate of the vessel was not negligent in failing to observe and prevent the stevedores from overloading the gear of Number 5 hatch, beyond its safe carrying capacity of 5 tons.

4. The Respondent, Atlantic and Gulf Stevedores, Inc., was not negligent in causing the loading gear including the swivel on the cargo hook at Number 5 hatch to be overloaded beyond its safe capacity.

5. The unseaworthiness of the vessel was the proximate cause of the Libellant's injuries and damages.

6. The Libellant was without fault and was not guilty of contributory negligence.

7. The Libellant is entitled to recover $7,000 and judgment may be entered accordingly.

The Libellant's request for findings of fact are approved with the exception of numbers, 5, 8, 12, 13, 14, 20, 21, 22, 23, 24, 32, 35, 36, 37, 39, 40 and 41, and his request for conclusions of law are approved with the exceptions of numbers 4 & 5.

The requests of the Third-Party Respondent, numbers 2, 4, 5, and 6, are approved and numbers 1 and 3 are denied.