### EAGLE INDEMNITY CO., to Use of BEALL v. UNITED STATES LINES CO.

No. 3078.

United States District Court
D. Maryland.

Nov. 7, 1949.

Daniel E. Klein, Baltimore, Md., Mezger & Mezger, Baltimore, Md. (W. Giles Parker and I. Winston Mezger, Baltimore, Md.), for plaintiff.

Ober, Williams, Grimes & Stinson, Baltimore, Md. (William A. Grimes, Baltimore, Md.), for defendant.

CHESNUT, District Judge.

This case presents a libel in personam for injuries sustained by Willis L. Beall, a carpenter in the employ of The Waterfront Company, engaged as an independent contractor in "ship ceiling" on the ship "American Veteran" on March 1, 1947 while docked at a wharf in the Baltimore Harbor. Beall obtained a compensation award from the Deputy Commissioner under the federal Longshoremen's and Harbor Workers' Compensation Act, 33 U. S.C.A. § 901 et seq. This award has been paid by the Eagle Indemnity Company,

the compensation insurer of The Waterfront Company. This suit has now been brought by the insurer as subrogee of Beall and the balance of recovery, if any, for the latter's personal benefit, as provided in the Longshoremen's Act. Recovery is sought on the principles of the general maritime law as announced in The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760, and Seas Shipping Co. v. Sieracki, 328 U. S. 85, 66 S.Ct. 872, 90 L.Ed. 1099.[1]

The injury to Beall was caused by the fall of a manhole hatch cover while he was descending a ladder leading from the opening of the hatch to the lower deck before his head had cleared the opening. In the libel it was alleged that the cover fell "because it was not properly secure in an open position". The libelant's contention is two-fold; that the fall of the manhole cover was due to negligence of the ship and if not, then to the alleged unseaworthiness of the ship with respect to the manhole cover. Both contentions are denied by the respondent.

From the evidence in the case I make the following findings of fact.

1. Willis L. Beall, the equitable libelant, was on March 1, 1947, 69 years of age and an employee of The Waterfront Company, a ship ceiling company, employed by the United States Lines Company, the respondent, to shore cargo on the SS American Veteran then docked in the Baltimore Harbor.

2. The SS American Veteran is a C-2 type cargo vessel built about 1943 by or for the United States Government and purchased by the respondent in the latter part of 1945 or the first part of 1946 in good condition and having standard equipment of a C-2 vessel. She is about 400 feet long, 60 foot beam and of seven thousand tons gross weight.

3. The means of access to the No. 4 shelter-deck, tween-deck and the lower holds of the SS American Veteran is by a hatch located just forward of the No. 4 after bulk-head consisting of ladders or iron rungs affixed to said bulkhead, one running from the main deck to the shelter-deck, another from the shelter-deck to the tween-deck and the third from the tween-deck to the lower hold. Access to the rung ladders from one deck to another is through a manhole on each deck, each manhole having a cover which can be fastened down by dogs or opened back on hinges affixed to the manhole and to the cover. The manhole is an opening in the surface of the deck but having a coaming surrounding the opening of an inch or two in height. Surrounding the manhole are upright vertical heavy wooden battens to prevent portions of the cargo being placed over the manhole. The manhole cover is oblong in shape, about 20 inches long in its longer dimension and constucted of steel weighing about 60 pounds. When opened by fully releasing the dogs by which it can be fastened down, it can be raised from the horizontal through the vertical to a position beyond the perpendicular before it comes to rest against the wooden battens. In this position by reason of its weight it would not fall unless manually handled or possibly somehow substantially jarred while moored in a quiet dock. But to prevent accidental fall or closing of the cover when the ship is at sea or to avoid falling from other interference or accidental jarring, there is a heavy hook fastened to the batten against which the cover when fully open rests, and a ring bolt in the cover through which the crook of the hook is inserted to securely fasten the cover back. The arrangement of the ladder leading from the main deck to the shelter-deck and from the shelter-deck to the tween-deck, is as shown in respondent's exhibits 1-A to 1-E inclusive. It is in accordance with the standard equipment of the C-2 type of ship.

4. On Saturday, March 1, 1947, the SS American Veteran was moored at Pier 3,

1. In the libel it was mistakenly stated that the jurisdiction of the court was based on 46 U.S.C.A. § 741 et seq., which constitutes the well-known Suits in Admiralty Act, of course not applicable to this case where the ship was not owned by the United States. The pleader was possibly confused by the corporate title of the respondent shipowner.

Locust Point, Baltimore, Maryland, and had been there for several days during which stevedores had been loading cargo. Employees of The Waterfront Company had been working on the vessel shoring up cargo on February 28, 29 and March 1, 1947. On Saturday March 1, 1947, the vessel was in charge of a relief mate, and most of the crew had been granted permission to go ashore, leaving only a skeleton crew aboard the vessel. None of the crew was working in the No. 4 hold on March 1, 1947.

5. About 9:30 P.M. on March 1, 1947, after the stevedores had finished loading cargo in the No. 4 holds, a group of Waterfront employees including Willis Beall, the equitable libelant, were ordered by their foreman into No. 4 lower hold. The No. 4 main hatch had been covered and The Waterfront Company employees used the "escape hatch", descending the ladder from the main deck to the shelter-deck, and then the ladder from the shelter-deck to the tween-deck, and then the ladder from the tween-deck to the lower hold. At least three Waterfront Company employees went safely through the manhole to the shelter-deck and on down toward the lower hold. As Willis Beall was descending the ladder from the shelter-deck to the tween-deck and was nearly through the manhole on the shelter-deck, the manhole cover fell, from some unknown reason, striking Willis Beall on the head and crushing his face against the manhole coaming.

6. At the time of the accident to Willis Beall, there was a hook attached to a cargo batton immediately behind the manhole cover in the raised position which could be put through the ring-bolt in the manhole cover and secure the manhole cover in the open position.

7. Shortly after the time of the accident to Willis Beall, the foreman of his gang, Cecil Beall (the son of Willis Beall) says he told Masters, the leader of the particular gang of which Willis Beall was a member, to fasten back the hatch cover to prevent its again falling. Masters testified that he did so using a piece of rope which he tied around the batten. The inference contended for by the libelant is that the hook referred to constituting a part of the standard equipment, must have been missing. But there was no sufficient evidence to show that either the hook or ring-bolt were absent or defective or that the equipment in question relating to the manhole cover was other than standard equipment for C-2 type of ships.

8. The accident to Willis Beall was not reported by The Waterfront Company, or any of its employees, to the relief mate on duty on the SS American Veteran or anyone else aboard the ship at the time of the accident. The first knowledge of the accident by the United States Lines Company was a letter dated May 9, 1947, from Eagle Indemnity Company, the insurance carrier of The Waterfront Company, calling upon United States Lines Company for reimbursement of all of its expenditures on account of the accident.

9. The findings of the Deputy Commissioner in making the award were to the effect that the injury to Beall's nose and also to his left shoulder totally disabled him from performing his prior activities as a carpenter, and he was therefore awarded compensation for 56 weeks at $23.49 per week, the same to continue until a change in his condition which has not yet occurred. Independent affirmative evidence by the libelant in this case tends to confirm the finding of the Deputy Commissioner with repect to disability. The insurer has paid to date a total of $3129 to Beall.

Conclusions as to Ultimate Facts

As the stevedores and ship ceilers had been in charge of the ship for the loading and stowing of cargo for several days prior to March 1, 1947, when the accident to Beall occurred, and in the absence of any evidence to the contrary as to the operation of the manhole cover by the ship, I find that the manhole cover was not legally and factually under the management or control of the ship, its officers or crew, at the time, and its fall from an unknown cause was not due to any defective construction or negligent operation of the manhole cover attributable to the officers or crew of the ship or to the ship itself. And I find also that at the time of the accident

the equipment of the ship with respect to the manhole cover was not defective or otherwise classed as unseaworthy and the accident to Beall was not due to the unseaworthiness of the ship.

■ The only question of law presented by the case is whether the occupation of a ship ceiler, that is the shoring of cargo to prevent its shifting during the voyage, is of such a nature that the occupation can properly be considered in the same class with stevedoring; and thus bring this particular case within the doctrine of the majority opinion of the Supreme Court in Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099. As will appear from the dissenting opinion of Chief Justice Stone in that case the decision marked an extension of the previously understood maritime law by imposing on a shipowner the obligation of seaworthiness (previously held applicable to seamen only) to a *stevedore* while working aboard the ship. In this case the libelant contends, while the respondent denies, that the occupation of a ship ceiler is substantially in the same class as that of stevedores, as determined in the Sieracki case. Since that case was decided there has been considerable discussion in the lower federal courts as to how far the doctrine of the case should be extended with respect to the employees of independent contractors other than stevedores. In Lynch v. United States, 2 Cir., 163 F.2d 97, it was questioned whether the principle of the Sieracki case could properly be extended to an electrician's helper employed by a ship repair company as an independent contractor. In Guerrini v. United States, 2 Cir., 167 F.2d 352, 1948 A.M.C. 724, the Second Circuit in an opinion by Judge Learned Hand, concluded that the doctrine should not be extended to the employees of such an independent contractor. But in Sulovitz v. United States, 64 F.Supp. 637, 640, the District Court for the Eastern District of Pennsylvania, the principle was applied to a carpenter employed by a company engaged in furnishing ship supplies who was actually working in the ship in preparing it to receive a cargo requiring special provision for its stowage.

On this point I conclude that the occupation of a ship ceiler is so like that of a stevedore that the principles of the Sieracki case apply. Both occupations have direct relation to the proper loading and handling of the ship's cargo in preparation for the anticipated voyage. There seems to be no essential difference between the two occupations with respect to the determining considerations advanced in the Sieracki case by the majority of the court for the extension of the application of seaworthiness to persons other than the crew who are actually performing services of the ship, with respect to the loading of the cargo.

■ Before further discussion with respect to the alleged unseaworthiness of the ship, it is sufficient to say a brief word with regard to the charge of *negligence* in relation to the fall of the hatch cover.[2]

2. The libelant's theory of liability based on alleged negligence as an alternative ground of recovery to the alleged unseaworthiness of the manhole cover was not expressly developed by counsel for the parties. Prior to the Jones Act the maritime law did not impose on the shipowner liability for injury to the crew from negligence alone. The Jones Act of 1920, 46 U.S.C.A. § 688, created such a liability to members of the crew who were, of course, employees of the ship. In International Stevedoring Company v. Haverty, 272 U.S. 50, 47 S.Ct. 19, 71 L.Ed. 157, the Supreme Court treated a stevedore as a member of the crew within the meaning of the Jones Act. But after the passage of the Longshore-

men's and Harbor Workers' Act effective July 1, 1927, providing compensation for injured longshoremen and harbor workers irrespective of negligence of the employer, it seems to have been considered by the majority of decisions that longshoremen and harbor workers, including stevedores, were no longer to be entitled to the benefit of the Jones Act as they were expressly covered under the Longshoremen's Act which excluded members of the crew. See Robinson on Admiralty, pp. 318–24; Nogueira v. New York, N. H. & H. R. Co., 1930, 281 U.S. 128, 50 S.Ct. 303, 74 L. Ed. 754; Obrecht-Lynch Corp. v. Clark, D.C.Md.1929, 30 F.2d 144, 146. However, the Sieracki case is to the effect

There was no evidence in the case tending to show negligence on the part of officers or crew of the ship. For several days before the accident the ship had been in the hands of stevedores and ship ceilers loading the cargo and preparing it for the voyage. Practically the entire crew and officers of the ship except a relief mate, were on shore leave or otherwise off-duty during these days. The evidence as to customary practice under such conditions is that the ship's appliances are ordinarily under the control and management of the stevedores and ship ceilers subject only to inspection from time to time by a ship's officer, in this case the relief mate. The log of the ship shows that several such routine inspections were made on the very day of the accident. Nothing unusual was observed with respect to the hatch cover.

For the moment at least we will assume that the hatch cover and the method of securing it did not constitute defective equipment. Therefore it was the use or operation of the appliance rather than its defective condition at the time which was responsible for the accident. The most reasonable inference from the whole case is that the hatch cover fell because when it was last opened before the accident it was not pushed back to the full extent until it was leaning against the battens and beyond the vertical position away from the manhole opening. In that position it would not have been dangerous and presumably would not have fallen unless by some external force, of which there was no evidence. The evidence is entirely lacking as to what person last dealt with the hatch cover. There is no evidence that it was last opened by an officer or member of the crew of the ship; nor was there any evidence that it was customary or otherwise the duty of the crew to attend to the hatch cover during the

period of a week that the ship had been turned over to stevedores and ship ceilers. There was evidence of custom that when the ship is at sea the manhole covers are fastened down but that in port they are usually kept open, and when the ship is turned over to stevedores for loading cargo they frequently use these particular manhole hatch-ways to get in and out of the holds, after access to the main hatches is closed by the loaded cargo. Therefore I deem it the reasonable conclusion that the accidental fall of the hatch cover was due to faulty operation rather than defective equipment, and occurred at a time after the operation of the ship's equipment had been turned over to the stevedores and ship ceilers. In Grasso v. Lorentzen, 2 Cir., 149 F.2d 127, 129, a longshoreman handling cargo was injured on a ship while using a strap made of 1-inch wire rope which was looped around a gusset or bracing plate and ran at right angles from the side of the ship to the iron frame of the deck. He was injured by the breaking of the strap. In holding that the break of the strap was not due to negligence of the ship, Judge Chase said, 149 F.2d at page 129:

"But unless this strap was proved to be defective when the stevedores began to use it, the shipowner was not liable for injuries caused by its breaking. It was not under a duty to inspect and if necessary to repair or replace the strap after the stevedores began using it." See also Lauro v. United States, 2 Cir., 162 F.2d 32, 34; Lynch v. United States, 2 Cir., 163 F.2d 97, 98; Guerrini v. United States, 2 Cir., 167 F.2d 352, 1948 A.M.C. 724, 726; Cioffi v. New Zealand Shipping Co., D.C. 80 F. Supp. 98, 1948 A.M.C. 789.

The principal contention of the libelant is that the ship was unseaworthy by reason of the alleged defective condition of the hatch cover. The evidence re-

that a longshoreman, such as a stevedore, can at his option take the benefits of the Longshoremen's Act or sue a third party such as a ship for negligence if the facts justify it. And if the injured longshoreman has been paid an award under the Longshoremen's Act by his employ-

er's insurer, the latter can sue the ship as subrogee. See Seas Shipping Co. v. Sieracki, 328 U.S. 85, 102, 66 S.Ct. 872, 90 L.Ed. 1099, and Swanson v. Marra Bros., Inc., 328 U.S. 1, 66 S.Ct. 869, 90 L.Ed. 1045.

lied on for this contention is the statement made by Beall's son as foreman of his gang, and Masters, the leader of the gang. Beall the foreman says that he told Masters to tie back the cover so that it would not fall again, and Masters says that he did tie it back by fastening a rope through the cover and around the nearby batten. Without questioning the good faith of these witnesses, I am not impressed with either the accuracy of this bit of their testimony or the inference sought to be drawn therefrom to the effect that the hook or ring-bolt provided as standard equipment must have been missing. Masters, the witness who stated that he tied the cover back, was very deficient in his recollection about other details of the accident. In answer to various questions he repeatedly said that he did not recall and specially and expressly with regard to the question as to whether either the hook or the ring-bolt was absent he could not say because apparently he did not notice. If at the time he had been impressed with the dangerous or defective condition of the cover it would seem only natural that he would have reported it to the relief mate on the ship. But neither he nor the foreman did so, and, as already stated, no report of the accident was made to any officer of the ship or to the shipowners until more than two months after the occurrence.

Furthermore the testimony was not given until 30 months after the accident and there was no evidence tending to show that what the witness then stated had been brought to the attention of any one representing the ship prior to the trial of the case. Nor did it appear that the present libelant, the insurer, when in May 1947 it for the first time made demand for indemnity upon the shipowner, then stated the basis for the fault of the ship. On the contrary there is persuasive evidence that the present contention with respect to alleged defective equipment was never advanced until the trial of the case. Thus in the libel filed September 2, 1948, 18 months after the accident, it is alleged in paragraph 6th that the manhole cover fell "because it was not properly secure in an open position". More importantly, on April 29, 1947, within two months after the accident, Willis Beall, the injured man, made a written and signed statement in which he stated "the hatch cover, which is of steel, was raised and against the bulkhead. Several men had gone down the hatchway when I started to climb down. I had gotten down, except for my head when the hatch cover fell, striking me on top of my head. * * * All the workers on the ship at the time of my injury, I am sure were all Waterfront Company workers. *It would be difficult to say who left the hatch cover unhooked, as apparently that was the case.*" (Italics supplied)

The finding and award made by the Deputy Commissioner (put in evidence by libelant) included the statement "that while on the ladder and before his head had cleared the main hatch, the manhole cover made of steel, became unhooked and fell on the back of the claimant's head."

Weighing this evidence in connection with the case as a whole, I have concluded as a fact that the fall of the manhole cover was not due to any defective equipment of the ship and that the evidence failed to establish that the ship was unseaworthy or that the injury to Beall was due to unseaworthiness of the ship.

■ One of the legal arguments for the libelant asserts a very broad proposition of alleged liability of the shipowner. It is to the effect that the liability in this case is established when the libelant shows that neither Beall nor any member of his immediate gang of ship ceilers originally opened the hatch cover. The contention is that if any one else whether a stevedore or member of the ship ceilers gang other than Beall last raised the cover, the ship is liable even though there is no evidence whatever that either in fact or by custom the cover was opened or should have been policed after being opened, by the ship's crew. In other words, the argument seems to be that it was the affirmative, positive, non-delegable duty of the ship to inspect and securely fasten back the hatch cover before Beall's gang used the hatches to get into the hold. No evidence of such a customary or required duty was offered in this case and no authority is cited to support

the broad proposition as a matter of law. There was some evidence to the effect that the manhole cover was open when the gang started down because in the hold there were cluster lights from a cable running from a power plant on the main deck (a part of the ship's equipment) and that the cable had to be led through the manhole opening and would have been cut or short-circuited if the cover had been on at the time. But assuming this, it nevertheless does not appear from the evidence who last opened or handled the cover before the accident. The ship had been in the hands of stevedores followed by ship ceilers for the prior week. There was evidence that it was customary that the hatchways are shut down when the ship comes into port, but are opened by stevedores and are usually kept open until the ship is again ready to sail. It will also be recalled that three or more of Beall's gang had preceded him down the ladder without incident. The log also showed that three or four times during the day of March 1, 1947 there had been routine inspection of the ship by the relief mate in the absence of the other officers of the ship. There was no evidence that any unsecure condition of the hatch cover was observed or called to the attention of the mate on his inspections. While, by the doctrine of the Sieracki case, a stevedore or a ship ceiler is entitled to the benefit of the obligation of the shipowner as to seaworthiness, it has been pointed out by the Second Circuit in several recent cases that when the owner surrenders control of part of his ship to stevedores his duty as to the part surrendered extends only up to the time the stevedores assume control. Lauro v. United States, 2 Cir., 162 F.2d 32, 34; Lynch v. United States, 2 Cir., 163 F.2d 97, 98; Guerrini v. United States, 2 Cir., 167 F.2d 352, 1948 A.M.C. 724, 726; Cioffi v. New Zealand Shipping Co., D.C., 80 F.Supp. 98, 1948 A.M.C. 789.

In the Sieracki case the Supreme Court has made a liberal extension of the protection of the admiralty law to longshoremen working on a ship in port. This puts them in an even more favorable position than the crew of the ship who are expressly excluded from the benefits of the Longshoremen's and Harbor Workers' Compensation Act. The libelant in this case asks not only the benefit of this liberal extension of the law, to which I find he is entitled, but also to a too favorable finding of fact, to which I conclude he is not entitled. On the evidence in this case it would be entirely too speculative to find the ship unseaworthy.

For all these reasons I conclude that the libel must be dismissed with taxable costs.