**OSNOVITZ v. UNITED STATES et al.**

No. 11 of 1950.

United States District Court
E. D. Pennsylvania.

Dec. 18, 1951.

Freedman, Landy & Lorry, Philadelphia, Pa., for libellant.

Gerald A. Gleeson, U. S. Atty., and Krusen, Evans & Shaw, all of Philadelphia, Pa., for United States.

J. Webster Jones, John F. Thaete, Philadelphia, Pa., for Maritime Ship Cleaning, etc.

KALODNER, Circuit Judge.

This is a third party action by a longshoreman to recover for injuries allegedly suffered while loading ship's stores on board the U. S. N. T. "Shawnee Trail". The original respondents, the United States and American Pacific Steamship Company, have impleaded libellant's employer as an additional respondent, under Admiralty Rule 56, 28 U.S.C. The libel was brought against the United States by virtue of the Public Vessels Act, 46 U.S.C.A. § 781.

On the basis of the pleadings, testimony and exhibits submitted to me, I make the following

### Findings of Fact

1. On October 1, 1948, respondents, the United States and American Pacific Steamship Company owned and operated the U. S. N. T. "Shawnee Trail" as a public vessel. The "Shawnee Trail" was a tanker of the T-2 type.

2. On October 1, 1948, libellant was employed as a stevedore by the impleaded respondent, Maritime Ship Cleaning & Maintenance Co., Inc. (hereinafter referred to as "Maritime").

3. At about 5 P.M. on October 1, 1948, libellant and other employees of Maritime came aboard the "Shawnee Trail", and commenced loading stores into the icebox of the vessel pursuant to an oral contract entered into between Maritime and representatives of the owners and operators of the vessel.

4. It was not yet dark when the stevedores commenced work. Shortly after they came aboard the Chief Mate of the vessel caused the lights on the ship's catwalk to be turned on in compliance with the request of Maritime's stevedore foreman. In addition to the catwalk lights there was a light on the after-housing of the vessel.

5. The stores were brought from the dock to the icebox under the direction of the stevedore foreman. Once inside the icebox they were stowed by the stevedores at the direction of a member of the ship's galley department.

6. At about 10 P.M., while engaged in carrying stores over the deck to the icebox, libellant caught his foot in a padeye[1] which was welded to the deck of the vessel, forward of the after-housing, and was caused to fall, twisting his left foot and striking his side and back.

7. The padeye was located at a point on the deck which was not adequately lighted. The padeye was painted black and the deck was painted red.

8. Libellant returned to work the day after the accident; but on the following day he went to see his family doctor, as his foot was still bothering him. His family doctor referred him to Maritime's insurance carrier, which in turn sent him to the compensation clinic at the Pennsylvania Hospital in Philadelphia.

9. Libellant received outpatient treatment at the Pennsylvania Hospital from October 7, 1948, to December 15, 1948. During this period he complained only of pain in the lower shin and ankle of his left leg.

10. On December 1, 1948, he was referred by the insurance carrier to Dr. J. R. Martin, who saw him again on December 20, 1948, and on January 31, 1949. On these

---

[1] An inverted U-shaped fitting, used to shackle gear to the deck through the eye.

240

three occasions libellant complained of pain in his left shin and ankle, but made no mention of any injury to his great toe.

11. On February 4, 1949, libellant was examined by Dr. Chance, orthopedic consultant for the U. S. Public Health Service. This examination revealed for the first time that libellant was suffering from an arthritic condition known as hallux rigidis—or a stiffening of the great toe joint—of the left foot. Physiotherapy treatments were recommended for him at this time.

12. At the request of the insurance carrier, libellant received physiotherapy treatments from Dr. L. E. Snodgrass on February 23, 1949, and March 2, 1949. He complained to Dr. Snodgrass of pain in the region of his left great toe, but attributed these pains to the shoes he was wearing.

13. As a result of an informal conference held on March 15, 1949, under the provisions of the Longshoremen's and Harbor Workers' Compensation Act, Maritime's insurance carrier was requested by the Deputy Commissioner administering the Act to pay libellant compensation for a period of eleven weeks. The Deputy Commissioner recommended that the case be closed upon payment of this amount, on the ground that the condition that libellant was then suffering from had not been caused by the accident on the "Shawnee Trail". This sum, amounting to $385, was received by libellant in due course.

14. Libellant consulted Dr. Abraham Myers on October 7, 1949, still complaining of pain in his left great toe. His condition was again diagnosed as hallux rigidis; and he received physiotherapy treatment at the direction of Dr. Myers from November 30, 1949, to April 6, 1950.

15. Libellant was examined by Dr. J. R. Martin again in March, 1951. Dr. Martin also diagnosed his condition as hallux rigidis of the left foot; but found in addition that the great toe of the right foot showed evidence of a similar, though not so advanced, arthritic condition.

16. Libellant was treated by Dr. Nathan Manus in April, 1945, for an injury to the first three toes of the left foot, which he received when a hatch cover he was handling fell on the foot. He was unable to work for 23 days as a result of this injury.

### Discussion

Libellant claims that he was injured as a result of: (1) the presence of the padeye on the deck and the manner in which it was maintained, which he claims, rendered the vessel unseaworthy; and (2) the negligence of the ship's officers in failing to adequately illuminate the deck in the area of the padeye. Neither of these claims is well-founded.

With regard to the first claim—I find that neither the presence of the padeye on the deck nor the manner in which it was maintained rendered the vessel unseaworthy, so as to enable libellant to recover under the doctrine of Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099. Captain Thurber, libellant's expert witness, testified that padeyes are generally removed from the deck of a vessel when they no longer serve a useful purpose; but he did not know whether the padeye in question should have been removed, or whether its location on that portion of the deck was proper or improper.

Captain Thurber also testified that "it is considered a practice of good seamanship" to paint padeyes and the immediate area around them a contrasting color, such as white or aluminum, to make them more readily discernible to persons in their vicinity. With regard to the padeye over which he tripped, libellant testified that he did not notice what color it was; his witness, Paltyon, stated that "it looked to me to be the same color as the deck", but that he couldn't be sure because of the poor lighting. However, respondents' witness, Kidlow, stated positively that the padeye was painted black and the deck red, and that this is the color combination which is used on the majority of tankers.

I cannot find the vessel unseaworthy on the sole ground that the padeye was not painted white or some other color. The important consideration is not the particular color used, but only that the padeye be maintained in such condition that it does not constitute a peril or hazard to persons using the deck. This padeye was painted

so as to contrast with the deck, and was colored in accordance with the standard practice on ships of this kind. It would be a harsh result indeed to conclude that the vessel was unseaworthy merely because one witness testified that "it is considered a practice of good seamanship" to use white or aluminum for this purpose.[2]

If the padeye on the "Shawnee Trail" constituted a hazard to this libellant, it was only because it was located at a spot on the deck that was not properly lighted, and I cannot hold the owners or operators of the vessel liable for any inadequacy in lighting that may have existed there at that time.

As was stated in Lynch v. United States, 2 Cir., 1947, 163 F.2d 97, 98, "when (the shipowner) surrenders control of part of his ship to the stevedore his duty as to the part surrendered extends only up to the time the stevedore assumes control." See also Goldberg v. United States, D.C.E.D. N.Y.1950, 91 F.Supp. 104; Eagle Indemnity Co., to use of Beall v. U. S. Lines Co., D.C.Md.1949, 86 F.Supp. 949; Cioffi v. New Zealand Shipping Co., D.C.S.D.N.Y.1948, 80 F.Supp. 98. I find that the portion of the deck over which libellant was walking at the time he fell was under the control of Maritime, his employer. Accordingly, when Maritime assumed control of that portion of the deck of the "Shawnee Trail" it also assumed the duty to keep it well lighted. It has been established that the stevedore gang came aboard the vessel at approximately 5 P.M. on the day in question, at which time it was not yet dark; that the lights on the vessel's catwalk were first turned on at the request of the stevedore foreman; and that libellant did not trip on the padeye until almost five hours later. In view of these facts, I find that, at the time of the accident, the responsibility for the proper illumination of the area had already passed from the ship's officers to Maritime's stevedore foreman, who was in charge of the loading operation.

Libellant contends that Maritime never assumed control of any part of the vessel, since there were members of the ship's crew and other shoreside personnel on board during the entire operation. I cannot subscribe to this contention. While it is true that, once inside the ship's icebox, the stores were stowed at the direction of a member of the vessel's crew, they were brought aboard—from the dock to the icebox door—under the direction of the stevedore foreman. It was his job to decide over what portion of the deck they should be carried; it was his responsibility to provide a safe route for the men who carried them. Therefore, libellant's only recourse, if any,[3] is to proceed against his employer under the terms of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 901 et seq.

Libellant has not succeeded in his attempt to show fault on the part of the owners or operators of the vessel. But even if he had, I find that the condition of which he now complains is not the result of the fall he suffered on board the "Shawnee Trail".

Libellant offered in evidence the testimony of Dr. Abraham Myers, who stated that he first examined libellant on October 7, 1949, which was more than a year after the accident; that he found him to be suffering from hallux rigidis of the left foot; and that, assuming no prior severe injury to the foot, that this condition was "directly attributable" to the accident on the "Shawnee Trail". Libellant also offered the records of the Pennsylvania Hospital to show that he was treated there for an injury of his foot immediately after the accident.

Respondents' witness, Dr. J. R. Martin, testified that he examined libellant on December 1, 1948 (two months after the accident), at the request of Maritime's insurance carrier; that libellant complained of having injured his leg in the area of the lower shin and ankle, but that he made no

2. Libellant has relied on the case of Bonnewell v. United States, 4 Cir., 1948, 170 F.2d 411. However, the padeye in that case was obstructing a narrow passageway, and was "indistinguishable in color from its surroundings." 170 F.2d at page 413.

3. I will not presume, in this litigation, to determine libellant's rights under the Act. See Finding of Fact #13.

mention of any injury to his great toe on that occasion or on either of two subsequent visits shortly thereafter; that he examined libellant again in March of 1951, when libellant for the first time complained to him of pain in the area of the great toe.

Dr. Martin testified further that he had x-rays taken of libellant's feet in March, 1951, and found him to be suffering from an arthritic condition in the great toes of *both* feet. Respondents also offered in evidence an x-ray of libellant's left foot which had been taken in December of 1948. This x-ray was taken primarily for the purpose of examining the lower shin and ankle, and only incidentally included the region of the great toe. Dr. Martin examined this x-ray in court and concluded from it that the arthritic condition was present at that time —two months after the accident—and that it had taken over a year to reach that stage of development. It was his opinion that libellant was suffering from a longstanding condition which originated from wearing improper shoes throughout his life.

Respondents also offered in evidence the following:

(A) the records of the Pennsylvania Hospital, to show that libellant made no complaint about his great toe when he went there for treatment after the accident.

(B) the testimony of Dr. L. E. Snodgrass, who stated: that libellant had been sent to him by Maritime's insurance carrier for physiotherapy treatments in February, 1949 (five months after the accident); that libellant was suffering from hallux rigidis at that time, which he (libellant) attributed to the shoes he was wearing.[4] Dr. Snodgrass stated that he could see no connection between the injury of October 1, 1948, and the condition of libellant's toe in February, 1949.

(C) the testimony of Dr. Nathan Manus, who stated: that he treated libellant in April, 1945 (more than three years prior to the incident on the "Shawnee Trail"), for

an injury to the first three toes of his left foot; that libellant told him that he had received this injury when a hatch cover he was handling dropped on his foot; and that libellant was unable to work for a period of 23 days on account of this injury.

Libellant has not succeeded in his attempt to establish a causal connection between his present condition and the incident on the "Shawnee Trail". Dr. Myers gave his opinion that the condition was due to the fall, but only on the assumption that the foot had not suffered any other severe trauma; and respondents have shown that there *was* a prior injury to the great toe. The other evidence offered by respondents speaks for itself. Therefore, in view of all the evidence submitted to me, I find that the present condition of libellant's foot was not brought about in any manner by the fall he suffered on board the "Shawnee Trail", on the night of October 1, 1948.

Accordingly, I state the following

## Conclusions of Law

1. The U. S. N. T. "Shawnee Trail" was not rendered unseaworthy by virtue of the presence or condition or the coloring of the padeye over which libellant tripped on the night of October 1, 1948.

2. That part of the U. S. N. T. "Shawnee Trail" on which libellant was injured was in the possession and control of his employer, Maritime.

3. The owners and/or operators of the vessel were not responsible for any inadequacy in lighting that may have existed on that portion of the deck where libellant fell.

4. There was no negligence on the part of the owners and/or operators of the vessel.

5. The hallux rigidis of libellant's foot was not caused by the accident which occurred on board the U. S. N. T. "Shawnee Trail" on the night of October 1, 1948.

6. The cause of action against all the respondents herein should be dismissed.

---

4. This testimony was corroborated by that of Mr. Lowe, Deputy Commissioner administering the Longshoremen's and Harbor Workers' Compensation Act, who stated that the libellant told him substantially the same story at the informal hearing in March, 1949. See Finding of Fact #13.

243

Libellant's recourse, *if any,* is under the Longshoremen's and Harbor Workers' Compensation Act.

An order may be submitted in accordance herewith.